[Crim. No. 13094. In Bank. May 28, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT
SONNY SAM, Defendant and Appellant.

Richard S. Buckley, Public Defender, Richard W. Erskine, Clive Martin and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, A. Barry Cappello and Lawrence Keethe, Deputy Attorneys General, for Plaintiff and Respondent.

MOSK, J.—Following a plea of not guilty to a charge of murder, defendant Robert Sonny Sam was convicted by a jury of involuntary manslaughter. He appeals that conviction.

On the evening of November 21, 1966, defendant was visiting his friend Vincent Michel, who lived in the same apartment building as defendant. He, Michel, the wife of Michel, and Jerry Martin, a friend, were talking and drinking together when Salvador Dominguez, a stranger to both Michel and defendant, walked in, somewhat disheveled. Dominguez asked for a drink and was given one, but soon he "started to get mean." He boasted that he was a professional karate expert and began leaping around the room in a simulated karate demonstration. When he insulted Michel's wife he was asked to leave.

Dominguez departed, but about 10 minutes later he returned and stood in the doorway calling defendant foul names and challenging him to fight. Finally defendant, who was apparently intoxicated by this time, lost his temper and chased Dominguez into the hallway. Dominguez ran into another apartment, with defendant in pursuit and Michel and Martin following. When defendant entered the apartment, Dominguez turned and assumed a karate stance with his hands up as if to strike, and leaped at defendant who threw Dominguez down and stomped his foot into the latter's stomach. Dominguez rolled over, cursing, and seemed to have the wind knocked out of him. Michel and Martin took defendant back to Michel's apartment, leaving Dominguez, apparently conscious, in the care of two men who occupied the apartment in which the altercation occurred.

The next day defendant went to check the apartment where Dominguez had been left. He found Dominguez lying on a bed, and blood over the bed and floor. Defendant immediately phoned for an ambulance, and Dominguez was taken to a hospital, where emergency surgery was performed. It was thought to be successful but Dominguez died two weeks later, apparently of injuries caused by a blunt blow or blows to the abdomen. At the trial there was medical testimony that such injuries would be "most unusual" from only one blow and that Dominguez had been suffering from a diseased liver,

which could possibly have caused a spontaneous hemorrhage.

It was not until Dominguez died two weeks after the alter-. cation that the police began to investigate. On December 7, 1966, Police Sergeant Melendres telephoned Mr. Riley, the manager of the apartment house, and was told there had been a fight involving Dominguez, defendant, and Michel. Melendres asked Riley to call defendant or Michel to the phone. Defendant was called, and he told Melendres he had "witnessed" a fight with Dominguez. Melendres asked him to come down to the police station to tell his story. At this time, according to his testimony, the police officer did not suspect defendant of any crime.

Defendant visited the police station, where he related a sketchy version of the incident to Melendres, without indicating that he had struck Dominguez. Defendant was not advised of his constitutional rights prior to this statement. The next day, suspicion now having focused on defendant through Melendres' subsequent conversation with Michel, defendant was again questioned at the police station. This time he was properly advised of his rights, but he volunteered a statement relating the details of the incident essentially as set out above. Defendant said he did not remember kicking Dominguez but must have done so if Michel said he did because at the time of the fight Michel was less intoxicated than he was.

At the trial, over defendant's vigorous objections, the prosecution introduced evidence of two prior acts of defendant purportedly to show his *modus operandi,* or common plan or scheme. Mrs. June Mary Carmona testified that in October of 1966, while she was living with defendant, she and defendant had a drunken quarrel and defendant kicked her in the ribs. She was hospitalized, and defendant pleaded guilty to assault and battery and disturbing the peace. John Lee Tubby, a long-time friend of the defendant, was questioned about an alleged fight in January of 1965, in which defendant had kicked him. Tubby testified he did not remember the incident, because he was too drunk at the time it supposedly occurred. He also did not remember signing a police report about the fight, even after being shown the report. Officer Meraz, who had investigated the Tubby incident, then was allowed to testify over objection that he had interviewed Tubby in the back of an ambulance, that Tubby had been drinking but did not appear to him to be drunk, and that Tubby signed a police report. Meraz related the details of the report, which indicated that defendant and several others had

knocked Tubby down and kicked him. This testimony was admitted as a prior inconsistent statement, both for the purpose of impeaching Tubby and as substantive evidence of the truth of the matter stated therein, under Evidence Code section 1235. Officer Meraz was cross-examined by defendant as to the report and also as to certain exculpatory statements made by defendant at the time and contained in the report.

Defendant testified in his own behalf. He denied kicking Mrs. Carmona or Tubby, and he asserted that he kicked Dominguez in self-defense when Dominguez seemed about to hit him, defendant being afraid he might be hurt by· a karate blow. Louisa Vallejo, Dominguez' sister, testified that her brother had telephoned her on the Saturday evening prior to the fight, complaining he had been beaten up by "some colored boys" and that his chest hurt and he could not breathe. She said Dominguez sounded as if he were drunk, rather than hurt. Mr. Riley, the manager, testified that. defendant did not have a reputation as·a vicious person.

Defendant contends the trial court erred in admitting the statements made to Sergeant Melendres and the evidence of the two prior incidents, and in refusing to give certain instructions as to ·self-defense and causation. We discuss the issues which require reversal, as well as those which will likely arise on retrial.

I

We begin by examining the admissibility of defendant's statements to Sergeant Melendres. As indicated, these were made on three occasions: over the telephone on December 7, at the police station the same day, and at the station on December 8. The telephone conversation is not in issue. ■ Prior to the third conversation, defendant was properly advised of his constitutional rights to remain silent and to have counsel, but he chose to tell his story. The statements which followed were clearly admissible.

As to the initial conversation at the police station, during which defendant was given no warnings, the record is incomplete. ■ The prosecution had the burden of proving the statements admissible. (*People* v. *Davis* (1967) 66 Cal.2d 175, 180 [57 Cal.Rptr. 130, 424 P.2d 682].) It is the position of the People that defendant was· neither under arrest nor "in custody" at the time of the first station conversation, which was merely a phase of a routine investigation, and therefore no warnings were required under *Miranda* v. *Arizona* (1966)

384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. ■ The test of "custody" to be applied in such a situation is whether defendant was "physically deprived of his freedom of action in any significant way or [was] led to believe, as a reasonable person, that he [was] so deprived." (*People* v. *Arnold* (1967) 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515].) ■ In *Arnold* the majority of this court found the question not fully answered by the record and ordered it to be decided on retrial by further evidence of the precise language used in summoning the defendant, the physical surroundings of the interview, and whatever other evidence might bear on the defendant's reasonable belief as to her freedom of action. (*Id.* at p. 449.) The record here is similarly in need of further development on retrial. Fortunately, there is precedent for the trial court's guidance.

In *People* v. *White* (1968) 69 Cal.2d 751, 761 [72 Cal. Rptr. 873, 446 P.2d 993], we stated that there were no "objective indicia of restraint or compulsion" where an officer " 'told [the defendant] that we had talked to several people that were down there, we were trying to determine what had happened the night before, we were taking statements from everybody concerned, and would he give us a statement. He stated that he would.' " This is essentially what the record shows in the instant case, although the language used is, of course, not identical. Defendant was neither a suspect nor was he apparently made to believe he was a suspect at initial contact. Certainly taking statements from witnesses who were at the scene, in and of itself, is routine police investigatory procedure and not "in-custody interrogation."

However, in *White,* the officer later learned of evidence focusing suspicion on the defendant, and thereafter "had no intention of permitting defendant to leave" without an explanation or a confession. (*Id.*) This was a sufficient showing of "in-custody interrogation" to require *Miranda* warnings. In the instant case the testimony indicates that defendant, who had informed the officer he had only "witnessed" the incident, was not in fact a suspect during the first two conversations, and, indeed, he came to the station voluntarily and was at all times free to leave. It thus appears that the only relevant evidence yet to be adduced concerns the atmosphere and physical surroundings and the statements of Officer Melendres during the "interrogation." If these likewise indicate a lack of restraint or compulsion, the prosecution will have successfully carried its burden of the admissibility of defendant's statements.

## II

Defendant next contends that the court erred in admitting the testimony of Mrs. Carmona and of Tubby and Officer Meraz relating to prior criminal acts, and that the latter testimony was also improper hearsay evidence. We first discuss whether either incident was admissible in any form.

As we stated in *People* v. *Kelley* (1967) 66 Cal.2d 232, 238-239 [57 Cal.Rptr. 363, 424 P.2d 947], and later reiterated in *People* v. *Haston* (1968) 69 Cal.2d 233, 244-245 [70 Cal.Rptr. 419, 444 P.2d 91]: "The general rule is that evidence of other crimes is inadmissible when it is offered solely to prove criminal disposition or propensity on the part of the accused to commit the crime charged, because the probative value of such evidence is outweighed by its prejudicial effect. [Citations.] The purpose of the rule is to avoid placing the accused in a position of having to defend against crimes for which he has not been charged and to guard against the probability that evidence of other criminal acts having little bearing on the question whether defendant actually committed the crime charged would assume undue proportions and unnecessarily prejudice defendant in the minds of the jury, as well as [to] promote judicial efficiency by restricting proof of extraneous crimes. [Citations.]

"However, under certain limited circumstances, when the evidence is sufficiently relevant, it may be admitted even though it embraces evidence of the commission of another crime. In *People* v. *Peete, supra,* 28 Cal.2d 306 [169 P.2d 924], this court pointed out that 'except when it shows merely criminal disposition [citations], evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged,' and noted that the general test of admissibility of evidence in a criminal case is whether it tends logically, naturally, and by reasonable inference, to establish any fact material for the People or to overcome any material matter sought to be proved by the defense. (28 Cal.2d at pp. 314-315.) It has frequently been recognized, however, that because of the sound reasons behind the general rule of exclusion, the relevancy of evidence of other crimes, and therefore its admissibility, must be examined with care. (*People* v. *Peete, supra,* 28 Cal.2d 306, 316.) The evidence should be received with 'extreme caution,' and if its connection with the crime charged is not clearly perceived, the doubt should be resolved in favor of the accused. . . .

"In determining the question of relevancy, certain guidelines have been recognized. ▮ It is settled that evidence of other crimes is ordinarily admissible where it tends to show guilty knowledge, motive, intent, or presence of a common design or plan. . . ." (See also Evid. Code, § 1101.)

In the instant case the evidence as to prior antisocial acts was offered and admitted ostensibly to prove "*modus operandi,* common scheme and plan and design."[1] The court maintained that such common scheme was shown by "the universal tendency here that when there is a confrontation between the defendant and someone else with whom he disagrees that he kicks the person." When defense counsel objected to this definition of "common scheme," especially since defendant did not deny that he in fact kicked Dominguez once, the court indicated the evidence might also go to "identity," because there was some question as to whether the victim had been kicked once or several times, and medical evidence suggested that one kick might have been insufficient to cause death. On appeal the People also attempt to justify the evidence as showing defendant's criminal intent and negating his claim of self-defense. We consider these grounds while keeping in mind the presumption for exclusion where there is substantial doubt as to relevance.

▮ *Modus operandi* is generally a means of proving the identity of the perpetrator of the crime charged, by demonstrating that the defendant had committed in the past other crimes sharing with the present offense features sufficiently unique to make it likely that the same person committed the several crimes. (See *People* v. *Haston* (1968) *supra,* 69 Cal.2d 233, 246-249; *People* v. *Cavanaugh* (1968) 69 Cal.2d 262, 273 [70 Cal.Rptr. 438, 444 P.2d 110].) That likelihood must then outweigh the prejudicial effect of the evidence. (*People* v. *Haston, supra,* at p. 246; McCormick on Evidence (1954) pp. 332-333.) ▮ However, there is no question in this case as to the identity of the person who fought with and kicked the deceased, at least once, and there is consequently no necessity to establish defendant's somewhat distinctive

---

[1]The two prior incidents were also brought out later in the trial during the prosecution's cross-examination of Mr. Riley, who had testified to defendant's good reputation. Riley denied having heard of the two incidents. We do not know whether the question of character would have been raised by defendant had the prior acts not already been admitted and related in detail. In any event, the propriety of the later use of the incidents to counter defendant's evidence of good character is not in issue as this was clearly not the purpose of their earlier admission. (See Evid. Code, § 1102 and comments thereto.)

*modus operandi* of using his feet as a weapon in an altercation.

On the related issue of whether *several* kicks were administered to Dominguez, evidence of prior fights in which defendant had kicked his adversary several times might have tended to show similar conduct by defendant on the occasion charged. However, so far as the record discloses, neither of the two prior incidents involved multiple kicks. Mrs. Carmona specifically testified that defendant kicked her "one time." And according to Officer Meraz, Tubby told him that several persons, including defendant, beat and kicked him, but the officer could not recall any statement that defendant kicked Tubby more than once. The prior incidents thus had no relevance to the issue of multiple kicks.

As indicated, the trial court defined "common scheme or design" as a tendency to act in a certain way under particular circumstances. This is in accord with the customary treatment of the term as identical with *modus operandi*, which we have already discussed. Insofar as "common scheme or design" perhaps more accurately implies "a larger continuing plan, scheme, or conspiracy, of which the present crime on trial is a part" (McCormick on Evidence (1954) p. 328), no connecting link between the prior and present acts was alleged or could reasonably be inferred. The acts were independent of one another and apparently spontaneous in each instance.

Only one of the bases urged for admissibility of the prior acts has any semblance of validity, and this was not articulated at trial but asserted belatedly on appeal by the Attorney General: to show criminal intent and negate defendant's claim of self-defense. But given the nature of the prior acts, even this seems a weak justification for admission.

Defendant alleged he kicked Dominguez in self-defense because of his fear the latter, a stranger to him, might be as proficient in karate as he had boasted. The prior acts established merely that defendant had (1) kicked his mistress during a drunken quarrel a month before the fight with Dominguez, and (2) kicked another man during a brawl more than two years earlier. As to probative value on the issue of self-defense, the factor of kicking was irrelevant as there was no assertion that defendant fought with his hands in self-defense but with his feet when he became an aggressor. In effect, two drunken fights over the past two years, in which defendant may or may not have acted in self-defense, were introduced to

suggest that a more recent altercation was not in self-defense. If there was a concatenation of events, it was tenuous at best, whereas the prejudicial effect of the evidence is patent.[2]

Even if we assume a relevance which we fail to perceive, the evidence would properly have been excludible as unduly prejudicial under the discretion allowed by Evidence Code section 352. We have elsewhere recognized the substantial prejudicial effect inherent in evidence of prior offenses (*People* v. *Haston* (1968) *supra*, 69 Cal.2d 233, 246), for which reason such evidence may be excluded despite apparent relevance.

This case is a dramatic illustration of the prejudice that can be injected into a trial through the device of demonstrating prior criminal acts. By use of this stratagem, the prosecution was able to place before the jury the largely irrelevant but manifestly harmful information that defendant was a man who often drank to excess and was frequently drunk; that he was often belligerent and fought with others; that he had been living with a married woman not his wife; that he had struck that same woman with sufficient force to hospitalize her; that he had helped to assault his good friend Tubby so severely that an ambulance and the police had to be called; that he had admitted to one assault and battery and had been charged with another. In short, defendant was made to appear to be an antisocial individual of generally bad character, an immoral person unworthy of the jury's belief or consideration. Certainly a substantial showing of probative value was required to justify admission of this prejudicial and inflammatory evidence so that the jury could dispassionately perform its function of ascertaining the truth as to the events involved in *this* case.

We recognize that because the ground of criminal intent and negation of self-defense was not advanced at trial, the testimony and argument did not adequately cover this issue and the court had no opportunity to assess its merits. On retrial the prosecution will have an opportunity to establish,

---

[2]Compare several cases in which the probative value as to negation of accident or self-defense was far more substantial: e.g., *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53] [abuse of prison guards over previous 10 years as proof that present injuring of guard not accidental]; *People* v. *Zankich* (1961) 189 Cal.App.2d 54 [11 Cal.Rptr. 115] [evidence of other unprovoked batteries within previous 24 hours as proof of absence of provocation by victim of present attack]; *People* v. *Toth* (1960) 182 Cal.App.2d 819 [6 Cal.Rptr. 372] [prior beatings of same person to show malice aforethought in present beating and to rebut testimony of amicable relationship]; *People* v. *Clapp* (1944) 67 Cal.App.2d 197 [153 P.2d 758] [prior abortions as proof of intent to abort and as negating accident or mistake].

if it can, a more substantial probative link between the proffered testimony and the issue of self-defense.

### III

A further source of error pervades the testimony of Officer Meraz regarding the prior inconsistent statements of the witness Tubby. We find this testimony to be inadmissible both for impeachment purposes and as substantive evidence.

 There is no longer any doubt in California that the admission against a defendant in a criminal case of prior inconsistent statements as substantive evidence of the truth of the matters stated therein is a violation of the confrontation clause of the United States Constitution. (*People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 141 P.2d 111], cert. den. (1969) 393 U.S. 1051 [21 L.Ed.2d 693, 89 S.Ct. 679].) This much is conceded, as it must be, by the People; but it is then asserted that the error was either waived by defendant or was nonprejudicial "beyond a reasonable doubt." (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

There was no waiver. Although at the time of trial the Evidence Code provided for the substantive use of prior inconsistent statements and *Johnson* had not yet been decided by this court, the deputy public defender, with remarkable prescience, anticipated the subsequent case law and vigorously objected on the ground of the unconstitutionality of the substantive use of Tubby's unsworn statements in the police report. Only when this objection was overruled did defense counsel cross-examine Officer Meraz as to the contents of and circumstances surrounding the report. He elicited testimony that the report contained, in addition to Tubby's statement, an exculpatory statement made by defendant at the same time, in which defendant denied kicking Tubby. This cross-examination constitutes the purported "waiver." An attempt to attack the merits of damaging testimony to which a party has unsuccessfully objected has long been recognized as a necessary and proper trial tactic, and it may not be deemed a waiver of a continuing objection. "Were it otherwise, one of the main functions of cross-examination would be most seriously impaired; for a party, after rightfully objecting to the admission of evidence, may by his cross-examination . . . render unnecessary his remedy by appeal from the court's erroneous action." (*Jameson* v. *Tully* (1918) 178 Cal. 380, 384 [173 P. 577].) And even if an appeal is re-

quired, counsel obviously cannot be certain of a reversal, and he must therefore take all necessary steps to meet all contentions, including those he considers clearly erroneous. (See *Hoel* v. *City of Los Angeles* (1955) 136 Cal.App.2d 295, 310-311 [288 P.2d 989] ; 3 Witkin, Cal. Procedure (1954) pp. 2260-2261.)[3]

■ We emphasized above the substantial prejudice inherent in the admission of evidence of prior crimes in general, and of the Tubby incident in particular. We are convinced that the prosecution has failed to sustain its burden of showing beyond a reasonable doubt that defendant was not prejudiced by the introduction, as substantive evidence, of Tubby's statement to Officer Meraz. (*Chapman* v. *California* (1967) *supra,* 386 U.S. 18.)

## IV

Even had Tubby's ''prior inconsistent statement'' been limited to impeachment purposes, however, it is contended that there was in fact nothing in the witness' trial testimony to impeach. This requires a brief analysis of the very nature of impeachment and of prior inconsistent statements.

■ Impeachment is the process of challenging or impugning the credibility of a witness. ■ One commonly used method of impeachment is the adducing of evidence of a prior statement by the witness inconsistent with his testimony on the stand, for which purpose the statement is not considered to be hearsay. (3 Wigmore on Evidence (3d ed. 1940) §§ 1017-1018; Evid. Code, § 1235.) ■ It will be recalled that at trial Tubby testified he had no present recollection of

---

[3] As Officer Meraz did not recall defendant's exact statement but did acknowledge the correctness of the police report, defendant's statement was properly admitted as past recollection recorded. (Evid. Code, § 1237.) The People now assert that if the report of defendant's statement was admissible on this basis, the report of Tubby's statement should likewise have been admissible. This contention completely overlooks the fact that both statements involved *multiple* hearsay objections. The past recollection recorded exception only alleviated the fact that Officer Meraz' written report was hearsay as to the statements therein *by* Officer Meraz, and in effect allowed the report to ''testify'' in place of the officer who wrote it. This still left the statements *to* the officer by the parties as hearsay declarations. No specific reason was given for the admission of defendant's statement, and it is not in issue on appeal. Tubby's statement to Meraz was admitted as a prior inconsistent statement. For the latter to have been past recollection recorded as to Tubby's words to Officer Meraz as well as the officer's words in the report, Tubby as well as Meraz would have had to acknowledge the truth and accuracy of the written statement. This Tubby was unable or unwilling to do. Therefore the report could properly ''testify'' in place of Meraz, but not in place of Tubby.

either the incident in which defendant allegedly kicked him or the report he gave to Officer Meraz, because he had been drinking at the time. This was his entire testimony. Purportedly to impeach this statement, the prosecution introduced Officer Meraz' testimony that Tubby did not appear to him to be very drunk at the time, together with the substance of the statement Tubby gave to Meraz, taken from the police report. This was ostensibly to prove Tubby had not in fact been too drunk to remember. Granted that the officer's experienced observation and the fact that a report was made and signed tended to impeach Tubby's assertion of drunkenness, it is not clear how the *contents* of that report impeached anything Tubby said on the stand. There is nothing necessarily inconsistent between the fact that Tubby gave a statement to the officer over two years earlier—or the substance of that statement—and his present claim of lack of recollection. Indeed, the circumstances can be quite consistent. (See fn. 6 *post.*) Whatever the propriety of impeachment of the witness on the collateral issue of his prior state of intoxication,[4] or even the present state of his memory, the prosecution's bootstrap attempt to introduce the contents of the report in the guise of demonstrating that the witness was not too drunk to sign it would, if upheld, inflict considerable violence on the rules of evidence, particularly the hearsay rule and the proper exceptions thereto. Because there is no inconsistency and therefore no impeachment value in statements the witness claims to have forgotten, "its only value to the proponent [would] be as substantive evidence of the facts asserted." (McCormick on Evidence (1954) p. 73; see Wigmore, *op.cit. supra,* § 1043, p. 736.) It is just such use, of course, that, as we pointed out in *Johnson,* the Constitution prohibits.[5]

---

[4]The comments to Evidence Code section 780 indicate that the former inflexible rule against impeachment on collateral matters has been modified to allow the trial court greater discretion, under section 352, in the admission of impeaching evidence.

[5]Compare Wigmore, *op. cit. supra* (1964 Supp.) p. 249: "Questions should be directed to the prior statement sought to be contradicted and not generally as to what was said by the witness on the occasion in question. Otherwise the opportunity would be afforded the party seeking to impeach the witness to present extraneous damaging evidence under the guise of impeachment."

The situation herein is not unlike that in *People* v. *Hopper* (1969) 268 Cal.App.2d 774 [75 Cal.Rptr. 253], in which the prosecution witnesses alleged loss of memory as to events and statements involving the defendant following the witnesses' escape from juvenile hall. Regarding the prosecution's attempt to "impeach" one of their statements by prior inconsistent statements the court said: "What was the purpose of the so-called impeachment? To prove that the witness was lying when she

■ Nor are we without ample authority for our conclusion that "The right of impeachment does not exist where the witness states he has no recollection of the fact concerning which he is examined." (*Sponduris* v. *Hasler* (1966) 246 Cal.App.2d 207, 214 [54 Cal.Rptr. 552].) This is not only the rule in California, but according to Wigmore (*op.cit. supra,* § 1043 [1964 Supp.]) it is the general English and American rule, confirmed by similar holdings in other jurisdictions. (E.g., *Westinghouse Elec. Corp.* v. *Wray Equipment Corp.* (1st Cir.1961) 286 F.2d 491, 493; *People* v. *Durkee* (1963) 369 Mich. 618 [120 N.W.2d 729].)[6] ■ In enacting section 1235 of the Evidence Code, the Legislature has retained the fundamental requirement that the witness' prior statement in fact be *"inconsistent* with his testimony at the hearing" before it can be admitted. That requirement was unfulfilled herein.

## V

As a final point defendant contends the trial court erred in refusing to give certain instructions as to causation and self-defense. It was defendant's theory that the death of Dominguez was or could have been caused either by a spontaneous hemorrhage due to a diseased liver or by the beating Dominguez took from some boys a few days before the fight with defendant. There was some evidence to support either theory. ■ Although we might agree with defendant that the instruction given on proximate cause[7] did not sufficiently

admitted escape from the juvenile hall? To all appearances the prosecution was not interested in attacking her admission of escape but in inoculating the record with her extrajudicial statement for its own sake. Prejudice slips in with such artfully contrived 'impeachment.' '' (*Id.* at p. 837 fn. 2.) The same might well be said of the attempt to ''impeach'' the witness Tubby in the instant case. (See also *People* v. *Flores* (1940) 37 Cal.App.2d 282, 286-288 [99 P.2d 326].)

[6]Wigmore expresses the belief that because a *present* statement of fact is impeachable by showing a *prior* lack of memory or knowledge, the reverse should also be true. (*Id.*) However, logic dictates the correctness of the existing distinction, since in the normal course of human experience one's memory fades with time, it does not improve. Thus whereas a prior lack of memory is indeed ''inconsistent'' with a present recollection, a present failure of memory is quite consistent with prior knowledge—especially where, as here, a two-year interval and considerable liquor have intervened between incident and trial.

Wigmore is also of the opinion that a trial court should have some discretion to admit allegedly forgotten statements. (*Id.*) But even a discretionary rule would seem to require exclusion of Tubby's prior statement.

[7]The following instruction on proximate cause was given:

''To constitute a felonious homicide there must be, in addition to the

cover the concept of an unforeseeable intervening cause (see *People* v. *Hebert* (1964) 228 Cal.App.2d 514 [39 Cal.Rptr. 539]), the theories advanced do not raise any question of foreseeability. If the kick by defendant was insufficient to cause death, and death was actually caused by a spontaneous hemorrhage or an earlier beating, defendant was not guilty of homicide. This is strictly a question of cause in fact, adequately covered by the proximate cause instruction which defined that concept as, inter alia, the cause "without which the result would not have occurred." No other theories or authorities were advanced to support the remaining instructions on proximate cause requested by defendant, and they were properly refused.

The instructions on self-defense present a different problem. Defendant's theory in this respect was that he kicked Dominguez after the latter turned and leaped at him, putting him in fear of bodily harm. The merits of this defense, including the question of whether defendant was, at the time of the kicking, an aggressor with no right of self-defense, are not before us.

 A defendant is entitled to an instruction on any theory, no matter how remote or incredible, which is supported by "any evidence deserving of any consideration whatsoever" (*People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281]), and here the trial court did instruct on self-defense, apparently considering the evidence sufficient to warrant such an instruction. It also instructed on involuntary manslaughter, which became the verdict of the jury. However, the self-defense instruction as given covered only the use of *deadly* force in defense against a reasonable fear of "death or great bodily injury."[8] Defendant maintains that the evi-

---

death of a human being, an unlawful act which proximately caused that death.

"The proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. It is the efficient cause—the one that necessarily sets in operation the factors that accomplish the injury. It may operate directly or through intermediate agencies or through conditions created by such agencies.

"This does not mean that the law seeks and recognizes only one proximate cause of an injury, consisting of only one factor, one act, one element of circumstance, or the conduct of only one person. To the contrary, the acts and omissions of two or more persons may work concurrently as the efficient cause of an injury, and in such a case, each of the participating acts or omissions is regarded in law as a proximate cause." (CALJIC No. 312.)

[8]The court gave CALJIC No. 322: "A homicide is justified and not punishable when committed by a person in the lawful defense of himself, when he has reasonable ground to apprehend that he is in danger of

dence supported the theory that he, although not in fear of "death or *great* bodily injury," employed only reasonable *non*deadly force, which was justified by a fear of *any* bodily harm.[9] On the assumption that there was some right of self-defense, we agree that although the victim died, a finding consistent with defendant's contention is possible. As the Kentucky Court of Appeals has interpreted an instruction similar to that given here: "Such an instruction embraces an *intentional* killing in self-defense and is the proper counterpart to instructions on murder and voluntary manslaughter, which are intentional homicides. . . . But where no deadly weapons are involved and the defendant is entitled to an instruction on involuntary manslaughter, an unintentional homicide, he is entitled to a further instruction on the theory of defense against ordinary assault and battery, against the menace of mere bodily harm as distinguished from the threat of death or great bodily harm." (Italics in original.) (*White* v. *Commonwealth* (1960 Ky.) 333 S.W.2d 521, 524.) If

---

*death or great bodily injury* and that there is imminent danger of such a design being accomplished. The acts which a person may do in self-defense and justify under a plea of self-defense depend upon the conduct of those involved in the encounter and the circumstances attending it. No fixed rule is applicable to every case, but certain general principles are established as guides for the jury's determination.

"The law of self-defense is founded on the principle of necessity, either actual or apparent, and in order to justify the *taking of a human life* on this ground the slayer, as a reasonable man, must have reason to believe and must believe that he is in danger of receiving *great bodily harm*; and further, the circumstances must be such that an ordinarily reasonable person, if he were in those circumstances and if he knew and saw what such person in real or apparent danger knows and sees, would believe that it was necessary for him to use, in his defense and to avoid *great bodily injury* to himself, such force or means *as might cause the death of his adversary*.

"A bare fear that a person's life or limb is in danger is not sufficient to justify a homicide. To justify taking the life of another in self-defense, the circumstances must be such as to excite the fears of a reasonable man placed in a similar position, and the party killing must act under the influence of such fears alone. The danger must be apparent and must be present and imminent, or must so appear at the time to the slayer as a reasonable man, and the killing must be done under a well-founded belief that it is necessary to save one's self from *death or great bodily harm*." (Italics added.)

[9]Defendant's position is aptly demonstrated by this example: If A strikes B lightly, but B is a hemophiliac and bleeds to death, A may be guilty of a homicide. (See, e.g., Focht, *Proximate Cause in the Law of Homicide* (1938) 12 So.Cal.L.Rev. 19, 27-28.) However, if B had first threatened A with harm and A had used reasonable, nondeadly force to repel B, again causing B's death because of his particular condition, A would have a valid claim of self-defense. In the instant case there was evidence that Dominguez was in a weakened condition from a liver disease and a prior beating when kicked by defendant, making it possible that death resulted from less than deadly force.

any instruction on self-defense was to be given—and, as indicated, the court believed the evidence so required—the instruction requested by defendant should have been included, at least in substance.[10]

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Fourt in the opinion prepared by him for the Court of Appeal in *People* v. *Sam* (Cal.App.) 73 Cal.Rptr. 473.

---

[10]Defendant requested CALJIC Nos. 621 and 622:

"It is lawful for a person who is being assaulted, and who has reasonable ground for believing that bodily injury is about to be inflicted upon him, to stand his ground and defend himself from such attack, and in doing so he may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent." (CALJIC No. 621.)

"A person who has been attacked and who is exercising his right of lawful self-defense is not required to retreat, and he not only may stand his ground and defend himself against the attack but may also pursue his assailant until he has secured himself from danger if that course appears to him, and would appear to a reasonable person in the same situation, to be reasonably and apparently necessary; and this is his right even though he might more easily have gained safety by withdrawing from the scene." (CALJIC No. 622.)

The trial court apparently felt that No. 621 was covered by the instruction given (No. 322), and that No. 622 was restricted to physical "attack" by the victim, rather than mere "assault" (although both use the term "attack"). If the instructions were considered confusing in this respect, they should have been modified, rather than refused.