[Crim. No. 39995. Second Dist., Div. Two. May 22, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
NICK ROBERT PLASENCIA, JR., Defendant and Appellant.

548

COUNSEL

Teri Schwartz, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Susanne C. Wylie and Jane Began Sagehorn, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**COMPTON, Acting P. J.**—On March 16, 1983, we filed our opinion in this matter affirming the judgment of the trial court finding defendant Nick Robert Plasencia, Jr. guilty of robbery (Pen. Code, § 211), attempted robbery (Pen. Code, §§ 664/211), and assault with a deadly weapon (Pen. Code, § 245, subd. (a)), and placing him on five years probation following commitment to county jail for six days.

Subsequently, the Supreme Court granted a hearing and retransferred the matter to this court for consideration in light of *People* v. *McDonald* (1984) 37 Cal.3d 351, 361-377 [208 Cal.Rptr. 236, 690 P.2d 709]. The primary issue in *McDonald,* as in the instant case, concerned the exclusion of the defendant's proffered expert testimony on eyewitness identification.

Before discussing the impact of *McDonald* on this case, we set forth that portion of our prior opinion which delineates the facts and disposes of the other issues raised by defendant.

Defendant's convictions stem from the unprovoked attack on four off-duty and unarmed security guards by a marauding group known as the Diamond Street Gang. We note here that the sufficiency of the evidence is not in dispute.

About 11 p.m., on the night of November 1, 1979, Alfred Blechman and a friend, Carlos Luna, had just finished work at the Bank of America's data processing center in downtown Los Angeles and were proceeding to a bus stop at the corner of Temple and Beaudry. Already waiting for them at that location was a mutual friend, Magidy Salib. As the three talked and waited, they were joined by yet another coworker, Larry Jacques, when he pulled up to the curb in his car. More conversation ensued.

Without notice or warning a group of approximately eight persons ran from across the street, surrounded the four men in a loose circle, and demanded their money. The gang, rapidly growing in size to well over 20 persons, became increasingly hostile. Using a knife, one in the group slashed two of the tires on Jacques' car. Others circled around Luna and made a demand at knifepoint for his money. Repeating that he had no cash, Luna stepped backwards and threw an athletic bag he was carrying onto the ground. In the scurry that followed, he turned and ran in the direction of the bank building. Although several in the gang took up pursuit, Luna was able to avoid capture.

Blechman reached the safety of Jacques' car and the two men drove to the bank to summon help. Salib, left to fend for himself, was beaten, kicked, and eventually stabbed by the mob. Upon seeing their remaining victims scatter, the gang began to disperse. With help on the way, both Jacques and Luna briefly returned to the scene, spotted one of their attackers and chased him to a nearby market. After recognizing several others involved in the assault, the men returned to the bank. Luna later recovered his athletic bag, but found that the keys to his home and some clothes were missing.

During a subsequent investigation by the Los Angeles Police Department, defendant was identified by several of the victims as a participant in the attack. In *Mirandized* statements and confessions obtained from fellow gang members Mario Monforte and Manuel Chavez, defendant was further implicated in both the assault and robbery.

At trial the defense was alibi. Defendant, along with several of his friends and relatives, testified that he was with his girlfriend at her home at the time of the attack on the four men.

■ Defendant argues that his conviction should be reversed on the ground that the admission into evidence of certain prior inconsistent statements identifying him as a participant in the assault and robbery violated his right to confront witnesses under article I, section 15 of the California Constitution.[1] We briefly set forth the pertinent facts giving rise to this contention.

During late November and early December of 1979, both Mario Monforte and Manuel Chavez were arrested by police investigators for their involvement in the gang-related attack. After voluntarily waiving their *Miranda* rights, both named defendant, also known as "Little Puppet," as a member of the Diamond Street Gang and placed him at the scene of the crime. At trial, however, Monforte was called as a witness for the prosecution and testified that he could remember only three of the participants, none of whom was defendant. He further claimed that he left the scene before the gang swept down upon its four victims and thus did not observe the actual attack. Monforte also indicated that he had lied to the arresting officers when he told them that he remembered "where the group from the bank got jumped." Over defense objection, the district attorney was permitted to introduce both the statements made by Monforte on the night of his arrest and his subsequent photo identification of defendant.

Chavez, also called to the stand by the prosecution, denied being at the scene altogether, maintained that any information he had given the police

---

[1]Article I, section 15 provides in relevant part: "The defendant in a criminal cause has the right to a speedy public trial, to compel attendance of witnesses in the defendant's behalf, to have the assistance of counsel for the defendant's defense, to be personally present with counsel, and *to be confronted with the witnesses against the defendant.*" (Italics added.)

was coerced, and that, in any event, he was unable to recall most of the statements he had made while in custody. Again, over timely objection, the People were allowed to introduce the witness' pretrial admissions.[2]

Relying upon Evidence Code sections 770 and 1235[3] the trial court held that the prior inconsistent statements of both witnesses were admissible. Defendant contends, however, that since Monforte and Chavez either denied being present at the scene of the attack or were unable to remember their pretrial statements, he was prevented from adequately cross-examining his accusers.

■ The fundamental requirement for admissibility of a prior statement of a witness, whether used to attack credibility or to prove the truth of the facts asserted in the statement, is that the out of court statement be inconsistent with some portion of the witnesses' current testimony. In *People* v. *Green* (1971) 3 Cal.3d 981 [92 Cal.Rptr. 494, 479 P.2d 998], our Supreme Court dealt with the issue of whether prior statements could be introduced when the witnesses' in-court testimony consists primarily of evasive answers and lapses of memory. The court concluded that "[i]nconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation]." (*Id.* at p. 988.)

Even a cursory review of the record in the instant case makes clear that the in-court testimony of both Monforte and Chavez was inconsistent with their prior statements linking defendant with the gang's activities on the night of November 1, 1979. Moreover, the combination of evasive denials and "I don't remember" answers were sufficient to establish what may be termed "implied" inconsistencies. (Cf. *People* v. *Green, supra,* at pp. 988-989.)

The fact that both witnesses denied making all or even a portion of their prior statements did not render the evidence inadmissible. This was not a case where the answers elicited from the witness stand were based solely on a lack of recollection. (Cf. *People* v. *Sam* (1969) 71 Cal.2d 194 [77

---

[2]A third witness, Lorenzo Nava, also suffered from a deficient memory but did not implicate defendant, either at trial or prior thereto. Accordingly, we find it unnecessary to discuss any of the contentions relating to Nava's prior inconsistent statements.

[3]Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or (b) The witness has not been excused from giving further testimony in the action."

Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Cal.Rptr. 804, 454 P.2d 700].) The reluctance of both Monforte and Chavez to testify against defendant was readily apparent, as it was necessary for the trial judge to repeatedly warn them to make their voices more audible. Subsequent testimony established that neither witness was willing to corroborate any prior statement that would implicate a fellow gang member. Although the memories of the witnesses faltered when asked if they recalled the details of the attack or the statements given to the investigating officers, both were able to recount in detail the allegedly coercive tactics of the police and that they were nowhere near the scene when the crime occurred.

■ We find nothing in the record that impaired defendant's ability to confront and cross-examine either witness. Through vigorous questioning by defense counsel, the discrepancies in their accounts of the crime were fully explored and explanations offered. Both claimed that they had been forced to sign their statements under duress. While Monforte asserted that he had been threatened with deportation, Chavez maintained that he had been "pushed around" and told that if he didn't cooperate his "teeth would be knocked out." Under the circumstances, the jury was given more than an adequate opportunity to observe their demeanor and assess credibility. Accordingly, the prior statements of both witnesses were properly admitted into evidence.

■ We turn next to defendant's argument that the trial court committed reversible error when it instructed the jury that "gang membership alone does not establish guilt." Although agreeing that some instruction on this issue was necessary, defendant maintains that the language employed by the court allowed the jury to convict on the basis of guilt by association. In support of his position, defendant refers us to several recent decisions in which criminal convictions were reversed because of the possibility of irrelevant and impermissible inferences being drawn from evidence of gang membership. (See *People* v. *Cardenas* (1982) 31 Cal.3d 897, 904-906 [184 Cal.Rptr. 165, 647 P.2d 569]; *People* v. *Perez* (1981) 114 Cal.App.3d 470, 477 [170 Cal.Rptr. 619]; *In re Wing Y.* (1977) 67 Cal.App.3d 69, 79 [136 Cal.Rptr. 390].) Defendant's reliance on these cases is misplaced.

In the instant case, unlike *Cardenas, Perez,* or *Wing Y.,* gang membership was an integral and unavoidable fact relevant to identity, bias and motive. "[I]t has repeatedly been held that it is proper to introduce evidence which is even unpleasant or negative pertaining to an organization in issue which is relevant on the issue of motive or the subject matter at trial." (*People* v. *Frausto* (1982) 135 Cal.App.3d 129, at p. 140 [185 Cal.Rptr. 314].) Here, the evidence introduced logically and naturally aided the prosecution in rebutting the presumption of innocence by showing a reason for defendant's criminal behavior. In turn, the defense was able to use the issue of gang

association to establish that the crimes charged in the information were committed not by defendant but by other hardcore members. (Cf. *People* v. *Dominguez* (1981) 121 Cal.App.3d 481, 498-499 [175 Cal.Rptr. 445].)

Although gang membership may have a significant number of unsavory connotations in present day society, defendant was not being tried for his mere association with Diamond Street members. The instruction offered by the trial court made this clear. Our review of the record convinces us that there was no real danger that the jury would improperly infer that defendant had a criminal disposition simply because he was associated with a youth gang. We further note that defendant's proposed instruction differed only slightly from the one actually read to the jury.[4]

The court's specially prepared instruction, in conjunction with CALJIC No. 2.00 (circumstantial evidence), CALJIC No. 2.20 (credibility of witnesses), CALJIC No. 2.22 (weighing conflicting testimony), and CALJIC No. 2.90 (presumption of innocence/burden of proof), guaranteed that the jury was fully instructed on the " ' 'general principles of law relevant to the issues raised by the evidence.' " (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].)

■ We next consider whether the trial court erred in prohibiting defendant from offering expert testimony on the issue of eyewitness identification.

During a hearing outside the presence of the jury, defendant sought to introduce the testimony of Dr. Robert Shomer, a psychologist, concerning the inaccuracy of eyewitness identification. As part of its offer of proof, the defense submitted a 27-page document summarizing the nature of Dr. Shomer's research and delineating the ways in which it is possible for witnesses to be subjectively positive in their identification and yet be in error.[5] The trial court also heard extensive testimony as to the doctor's qualifications.

Although it is somewhat unclear from the record, it appears that if called Dr. Shomer would not have offered an opinion about the reliability of any particular witness' identification but rather would testify about various studies and experiments involving psychological factors affecting eyewitness

---

[4]Defendant asked that the following instruction be given: "Membership in a gang or group is not evidence of guilt, and may be considered by you only for the purpose of evaluating the credibility of witnesses and the identification process utilized in this case."

[5]The 27-page offer of proof actually had been prepared a year earlier for another criminal case in which the defense sought to introduce Dr. Shomer's testimony.

identification in general, including inferences on cross-racial identification, weapon focus, and the effect of stress.

The trial court concluded that evidence of the type proffered by the defense had not yet reached a state of acceptability in the legal community and therefore could not be used at trial. The court further expressed its ruling in the following manner: ". . . I am not questioning anything about [Dr. Shomer's] ability as a psychologist at all. . . . [T]here are not sufficient standards in the matter and I still am not sure what a, quote, eyewitness identification expert is, and I feel there has not been a sufficient showing as to that . . . ."

The Courts of Appeal have in the past uniformly found no abuse of discretion when the trial court had excluded expert testimony on eyewitness identification. (*People* v. *Bradley* (1981) 115 Cal.App.3d 744, 751-752 [171 Cal.Rptr. 487]; *People* v. *Brooks* (1975) 51 Cal.App.3d 602, 608-609 [124 Cal.Rptr. 492]; *People* v. *Guzman* (1975) 47 Cal.App.3d 380, 385-386 [121 Cal.Rptr. 69]; *People* v. *Johnson* (1974) 38 Cal.App.3d 1, 6-7 [112 Cal.Rptr. 834].)

In *People* v. *McDonald*, however, the court rejected the reasoning of the foregoing cases and concluded: "When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (*Id.,* 37 Cal.3d at p. 377, fn. omitted.)

In qualifying its holding, the court went on to state: "We reiterate that the decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion; like the court in *Chapple,* 'we do not intend to "open the gates" to a flood of expert evidence on the subject.' (660 P.2d at p. 1224.) We expect that such evidence will not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter." (*Ibid.,* fn. omitted.) The court then concluded that depending on the facts of a given case, the error in excluding expert testimony could be harmless. (*Ibid.*)

Applying the *McDonald* standard to the case at bench, we remain convinced that the trial court was correct in refusing to admit defendant's prof-

fered evidence. Unlike *McDonald*,[6] the prosecution's case was not premised solely on eyewitness testimony.

Several weeks following the attack, Alfred Blechman positively identified defendant as one of the assailants after examining a group of police "mug-shots." Two days later, while standing in a court hallway, he again identified defendant when he turned to one of the investigating officers and said, pointing to Plasencia, "That's one of the guys right there." At trial, some two years later, Blechman testified that he had sharp recall about the participants, that their faces were "etched in my mind for a long time," but that he could not then make a positive identification because of the passage of time between the crime and his appearance in court.

Blechman's unequivocal pretrial identifications of defendant were *substantially corroborated by two of defendant's fellow gang members*. As previously noted, Chavez and Monforte named defendant as one of the participants in the assault. Although they repudiated their identification of defendant at trial, their prior *Mirandized* statements to investigators were properly admitted into evidence. (See discussion, *supra*.)

We also note that the various psychological factors affecting eyewitness identification about which Dr. Shomer proposed to testify were either not relevant, or only marginally relevant. The jury did not need edification on the obvious fact that an unprovoked gang attack is a stressful event or that the passage of time frequently effects one's memory. Here, Blechman candidly admitted that he could not identify defendant at trial because over two years had passed since the assault. Moreover, one victim, Magidly Salib, was so traumatized that he could not testify at all, and received psychiatric treatment after the incident until October 1980.

Other facts influencing the accuracy of eyewitness identification, such as the affect of racial or cultural differences and "subseption,"[7] would have

---

[6]In *McDonald*, the defendant was accused of murder. The victim was shot during an argument on the corner of a busy intersection during rush hour. The entire event lasted only a few minutes. Eight eyewitnesses testified; four made positive identifications in court, three made tentative identifications (ranging from having doubts about the identification to feeling it was debatable whether they could identify the perpetrator) and one was positive McDonald was *not* the perpetrator. Of the four witnesses who made positive in-court identifications, three admitted their view was obscured by parked and moving cars, two admitted they were frightened at the time of the incident, and one testified she deliberately kept her eyes averted from the perpetrator because of fear. None of the witnesses made a positive identification during the pretrial photographic lineup. No other evidence connecting McDonald to the crime was presented by the prosecution. In his defense, McDonald presented six witnesses who testified that at the time of the shooting he was in another state visiting relatives. This alibi was corroborated by cards sent by McDonald and telephone records.

[7]Defendant's offer of proof defined "subseption" as the merger of insignificant prior events with significant events so that "the person seen previously looks familiar and this familiarity is interpreted as being due to the perception at the time of the incident when in fact the perception is due to a time prior to the incident."

added little to the jury's understanding of the case. There is no indication anywhere in the record that the random victims had prior contact with the gang members either individually or as a group. While expert testimony concerning racial and/or cultural differences may have marginally aided the jury in assessing Blechman's identification, it was by no means essential.

Even were we to find that the trial court had abused its discretion in not allowing defendant to present his expert witness, we would be compelled to conclude that any error was harmless. Although Blechman was the only victim to be able to identify defendant as one of the perpetrators, the totality of the evidence adduced at trial amply supports the jury's verdict. Moreover, the vehicles of cross-examination, argument and instructions relating to the facts of this case, highlighted the psychological factors and unreliability of eyewitness identifications and focused the jury's attention on the issues. These vehicles, particularly cross-examination, could swiftly disabuse the jury of misconceptions it had about the reliability of eyewitness identification.[8] In light of the foregoing, it is not reasonably probable a different result would have occurred had the expert witness been allowed to testify. (See *People* v. *McDonald, supra,* 37 Cal.3d at p. 377; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment (order granting probation) is affirmed.

Beach, J., and Gates, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 1, 1985.

---

[8]Although the closing arguments are not included in the record on appeal, reference to defense counsel's strenuous closing argument on the possibility of misidentification was made by the prosecutor during the hearing on defendant's motion for new trial. We also note that the court instructed the jury pursuant to CALJIC No. 2.91, pertaining to the nature of eyewitness identification.