Filed 10/6/14  P. v. Lona CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B246123 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA357891) |
| v. | |
| HENRY LONA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Jose I. Sandoval, Judge.  Affirmed.

Johanna R. Pirko, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Mark E. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Henry Lona of the willful, deliberate, and premeditated attempted murder of David Diaz (Pen. Code, §§ 187, subd. (a), 664, subd. (a))[1] (count 1), and shooting at an occupied motor vehicle (§ 246) (count 4). With respect to both counts, the jury found true the allegation that defendant personally and intentionally discharged a firearm causing great bodily injury to Diaz within the meaning of section 12022.53, subdivision (d), and that the offenses were gang related within the meaning of section 186.22, subdivision (b).

The trial court sentenced defendant in count 1 to serve 40 years to life in prison. The sentence consisted of 15 years to life for the attempted murder and 25 years to life for the enhancement under section 12022.53, subdivision (d). Pursuant to section 186.22, subdivision (b)(4), the trial court stayed the sentence for the gang enhancement, since it had imposed the longer 25-year sentence for the firearm use enhancement. The court imposed the identical sentence in count 4 and stayed the sentence under section 654.

Defendant appeals on the grounds that: (1) the convictions must be reversed because the court abused its discretion and violated his constitutional right to present a complete defense by ruling that defendant could not call an expert on eyewitness identification; and (2) the gang enhancements must be vacated because the prosecutor failed to prove defendant was a member of a criminal street gang.

## FACTS

**Prosecution Evidence**

In June 2009, at approximately 11:30 a.m., Manuel Sanchez was driving in Los Angeles with his friend, Jesse Hernandez. Hernandez sat in the back seat of the car with her six-month-old daughter. A beige Camry pulled out of a motel driveway and cut off Sanchez's car. Hernandez saw four males inside the Camry, and they appeared to be gang members. Sanchez continued driving behind the Camry when both cars turned onto 51st Street. The Camry suddenly slowed down, stopped, and went into reverse. Sanchez also backed up because he thought the Camry was going to hit his car. When the Camry

---

[1] Unless stated otherwise, all further statutory references are to the Penal Code.

2

stopped, Sanchez saw a man get out of the Camry's front passenger seat, take out a gun, and start shooting at a car that was behind Sanchez and parked at the curb. David Diaz was seated in the driver's seat of the parked car. When the shooter stopped firing, he got inside the Camry, which sped away. Sanchez memorized the Camry's license plate number. Hernandez called 911 and gave the dispatcher the number. Diaz tried to drive away, but he crashed into some cars.

Sanchez later identified defendant in a photographic lineup. Hernandez identified a photograph of the Camry and also selected defendant's photograph from a photographic lineup. She identified defendant at trial as well. Sanchez could not identify defendant at trial.

Vinicio Jaramillo suffered a conviction for his involvement in the shooting that day, and he was in custody when he took the stand to testify for the prosecution at defendant's trial. Jaramillo was serving a sentence of 35 years to life. Jaramillo met defendant when Jaramillo was 25 years old and a Playboys gang member, as was defendant. Jaramillo thought defendant was about 20 years old. Jaramillo was in the 51 Clique, and defendant was a member of the 56 Clique of the Playboys. Defendant's moniker was "Lazy." At trial, Jaramillo testified he met defendant about two weeks or a month before the shooting. Jaramillo knew Diaz was a Playboys gang member called "Wicked," and he believed Diaz was from 51 Clique. Diaz was approximately 30 years old.[2] Diaz was in a dispute with some other Playboys gang members in June 2009, apparently because he had "punked" or disrespected some young Playboys gang members.

Jaramillo went to the Fiesta motel on the morning of the shooting and was surprised to see defendant there. Jaramillo was using his mother's car, and defendant asked him for a ride to get some beer. Jamarillo agreed, and they left with two other gang members. When defendant spotted Diaz, he told Jaramillo to park the car. Jaramillo

---

[2]     In June 2009, Diaz was 33 years old.

knew defendant had a gun. Jaramillo put the car in reverse and stopped because he was unable to park. Defendant stepped out, and Jaramillo heard five or six shots. Defendant got back into the car and told Jaramillo "to step on it." Jaramillo asked him why he had shot, and defendant told him not to get involved in his things and not to tell anyone.

Diaz was shot in the chest, and he also suffered a laceration to his thumb and a grazing wound to his forehead. There were bullet holes in the windshield of Diaz's car, the driver's door, the hood, and the "front window." Diaz refused to cooperate with police. When police officers attempted to serve Diaz with a subpoena, he ran inside his house and escaped through the back door.

Jaramillo was arrested five days after the shooting. Defendant was not a suspect at this time. Jaramillo told police the shooter had the moniker of "Little Lazy," and he had the name "Blanca" tattooed on his neck. It was this information that led to the discovery of defendant's identity and a photograph of him. Jaramillo then identified the photograph. Jaramillo wrote, "I identify No. 5. He shot for no reason another homeboy from the same hood. He was by my side, and I [did not] even know he was going to do that." Jaramillo identified a photograph of Diaz as the shooting victim.

Jaramillo testified that the tattoo of a Playboy bunny that defendant had on his neck at trial had not been there before. Defendant previously had the name Blanca tattooed in that spot. At his own trial, Jaramillo stated that he would testify against defendant whenever he was caught by the police. The prosecutor told him that if he testified she would write a letter to the parole board. He understood he would still have to serve the same sentence the judge gave him until he was eligible for parole. He understood that the parole board would decide whether he should be released.

Jaramillo acknowledged that he lied to police at first and said he was not at the scene of the shooting and knew nothing. He also lied when he told police his mother's car was not involved. He also admitted telling other lies to police and to the jury during his own trial. Jaramillo testified that he was "under protection" in county jail. He believed he would be separated and housed with others who are no longer gang members when he returned to prison.

4

Officer Jesse Drenckhahn of the Los Angeles Police Department testified as an expert on the Playboys gang. In June 2009, he served in the Newton Division gang enforcement detail, and the Playboys gang was one of the gangs he was assigned. Officer Drenckhahn testified that the Playboys gang is a Hispanic gang whose primary activities are vandalism, narcotics sales, gun possession, robberies, assault with deadly weapons, and attempted murders. The gang uses the bunny logo from Playboy magazine as one of its gang symbols. The gang contains several cliques, or subsections, that are affiliated with each other. The cliques formed around various streets in the gang's territory, e.g., the 46th Street clique, 49th Street clique, 51st Street clique, and 56th Street clique. Members of different cliques in the gang hang out with each other. Officer Drenckhahn testified regarding the importance of respect for the gang and for the individual gang members within the gang culture in general and in the Playboys gang. The willingness to commit crimes, especially violent crimes, earns respect for an individual gang member from his gang.

Officer Drenckhahn testified that defendant is a member of the 56 clique of the Playboys gang. In June 2009, defendant was 18 years old. He is five feet six inches tall, and his weight has varied from 140 pounds in 2006 to 160 pounds in 2009. In 2009, defendant had the name "Blanca" tattooed on his neck. At the time of trial, a Playboy bunny tattoo covered the Blanca tattoo. Defendant had more tattoos in general than he had in 2009.

When asked a hypothetical question based on the facts of the instant case, Officer Drenckhahn testified that he was of the opinion the shooting was done in association with and for the benefit of the Playboys gang. The shooting would enhance the gang's reputation and instill fear of the gang in the community, especially because it was an act of egregious violence in broad daylight and in front of a large portion of the community.

Officer Drenckhahn also testified as a gang expert at Jaramillo's trial. In that trial, he stated that all of the Camry's occupants knew what was going to occur and what their responsibilities were in association with that incident. Officer Drenckhahn explained that gangs have certain rules, and a code of discipline ensures the members follow those rules.

5

It was common for gang members to discipline other gang members for a variety of things. Officer Drenckhahn did not know the nature of defendant's dispute with Diaz, but he believed defendant felt disrespected by Diaz's actions because of defendant's ties to his fellow gang members. He drew this conclusion based upon defendant's actions.

**Defense Evidence**

The defense called Martin Flores as a gang expert. Flores works with youth offenders in South Los Angeles and Los Angeles County. He testified that the Playboys gang was a well-known gang in the Los Angeles area with various cliques and territories. In Flores's opinion, defendant was a Playboys gang member in 2009 based on his tattoos, as well as the fact he has been stopped and has associated with other gang members in the gang territory.

Flores testified that Hispanic gangs have hierarchies and there are protocols. They have to respect each other. There are sometimes "calentadas," or warm-ups between gang members due to disrespect. This could be addressed with a "beat down" or a verbal warning. He had often witnessed internal disciplining in a gang. Being a "youngster" in a gang was largely a question of age. Flores believed it was very unlikely that a youngster in the Playboys gang would have disciplined an "OG" or older gang member. The "go-to" person in the gang must be aware that a gang member is going to take such action. A gang member would disrespect the neighborhood by acting on his own.

When given a hypothetical based on the facts of the case, Flores stated that an act of discipline such as occurred in the hypothetical was very unlikely to occur. In Flores's opinion, conducting internal gang disciplining in public would not benefit the gang at all. It actually would hurt the gang and make it easier for rival gangs to believe they can attack the gang.

Flores stated that a lot of individuals who are in trouble present the best scenario for themselves to law enforcement rather than the "full scenario." Speaking with law enforcement is against gang rules, and an individual who does so would have to deal with the consequences in jail or prison.

6

## DISCUSSION

### I. Exclusion of Defense Expert on Eyewitness Identification

#### A. Defendant's Argument

Defendant argues that, in light of Jaramillo's pattern of dishonesty and the bias shown by his potentially obtaining an early prison release in exchange for testifying, his testimony did not provide substantial corroboration for the eyewitness identifications. As a result, defendant argues, under *People v. McDonald* (1984) 37 Cal.3d 351 (*McDonald*), disapproved on another point in *People v. Mendoza* (2000) 23 Cal.4th 896, 914, the trial court abused its discretion in excluding the proposed expert testimony on eyewitness identifications. According to defendant, the convictions must be reversed and the enhancements vacated.

#### B. Proceedings Below

The defense planned to call Dr. Robert Shomer as a witness. Near the end of the prosecution case, the prosecutor informed the court that defense counsel had told her Dr. Shomer would not be available until the following Monday. The prosecutor had intended to rest the following day, which was Thursday, May 17, 2012, and the jury was told the trial would end on Friday. The prosecutor renewed a previous objection to Dr. Shomer's testimony. She stated there was no basis for an eyewitness identification expert in the instant case because there was substantial corroborating evidence. Therefore, there was no need to extend the trial an extra day or to be dark for a day to enable Dr. Shomer to testify.

The court responded that it had also questioned the need for an eyewitness expert. The court stated its intention to consult the Evidence Code sections related to the opinions of experts.

The prosecutor asked the court to consider that the police were not aware defendant was a potential suspect until Jaramillo described the tattoo defendant had on the side of his neck, which read "Blanca," and which appeared on a prior booking photograph. Also, defendant's appearance had changed a great deal since the beginning of the case, and there was ample explanation for a witness not to recognize him in court.

7

The prosecutor asserted that identification by an individual who knew the defendant, Jaramillo, was substantial corroboration for both eyewitness identifications. In addition, the jury instruction regarding eyewitness testimony explained the essence of Dr. Shomer's proposed testimony. The court replied that it had considered these facts when it first raised the issue. The court invited the parties to provide supporting authority for their positions.

The following day, the trial court heard further argument from defense counsel and the prosecutor. The court stated it was a close call, but ruled that it would not allow Dr. Shomer to testify. Based on its research and consideration of the facts, the court believed there was substantial corroboration of the eyewitness identifications of defendant. Although defense counsel had "punched holes" in Jaramillo's credibility, it was not sufficient to overcome the testimony of a "codefendant" who had already been convicted of the crime and who stated defendant was the other person involved. The court found such testimony to be substantial corroboration of the witness identifications, although counsel obviously was free to argue the contrary to the jury.

### C. Relevant Authority

"'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.] . . . .' [Citation.] [¶] It follows, for the most part, that the mere erroneous exercise of discretion under such 'normal' rules does not implicate the federal Constitution. . . . [W]e have consistently assumed that when a trial court misapplies Evidence Code section 352 to exclude defense evidence . . . the applicable standard of prejudice is that for state law error, as set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (error harmless if it does not appear reasonably probable verdict was affected)." (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.) Thus, we review the trial court's ruling on the exclusion of expert testimony for abuse of discretion. (*McDonald*, *supra*, 37 Cal.3d at p. 373.)

8

"[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

### D. *No Abuse of Discretion or Error*

It is true that in *McDonald*, the court concluded that "although jurors may not be totally unaware of the [] psychological factors bearing on eyewitness identification, the body of information now available on these matters is 'sufficiently beyond common experience' that in appropriate cases expert opinion thereon could at least 'assist the trier of fact' (Evid. Code, § 801, subd. (a))." (*McDonald*, *supra*, 37 Cal.3d at p. 369.) While recognizing that the trial court has broad, although not absolute, discretion in the admission of expert opinion evidence, the *McDonald* court held that the trial court had excluded the testimony of the expert (who happened to be Dr. Shomer) based on incorrect assumptions and conclusions. (*Id*. at pp. 371-373.) The court stated that the exclusion of Dr. Shomer's testimony deprived the jurors of information that may have assisted them in resolving the crucial issue of the accuracy of the eyewitness identifications, which was the basis of the defense. (*Id*. at p. 376.) In that case, the error was not harmless because there was no other evidence connecting the defendant with the crime, and there was both eyewitness and alibi testimony favorable to the defendant, which made the issue of identification both "critical and closely balanced." (*Ibid*.) Upon examination of the entire record, the court believed it was reasonably probable a result more favorable to the defendant would have been reached in the absence of the erroneous exclusion of Dr. Shomer's expert opinion evidence. (*Ibid*.)

The court believed that such expert testimony would not, however, be needed often, and the trial court's discretionary rulings would be upheld on appeal. (*McDonald*, *supra*, 37 Cal.3d at p. 377.) The court stated, "When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected

9

the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (*Ibid*.)

In the instant case, we have no doubt regarding Dr. Shomer's qualifications or that the record shows the eyewitness identifications were made under conditions Dr. Shomer would find adverse to accurate eyewitness identifications. Nor do we doubt that the eyewitness identifications by Sanchez and Hernandez were a key element of the prosecution case. We do conclude, however, that the eyewitness identifications in this case were substantially corroborated by evidence that afforded them independent reliability. Moreover, the factors to which Dr. Shomer would have testified were laid out in CALCRIM No. 315 in a manner not available to the jury in *McDonald*.[3]  (See *McDonald*, *supra*, 37 Cal.3d at pp. 363, 372, and CALJIC No. 2.21 (4th ed. 1979.).)[4]  It

---

[3]      CALCRIM No. 315 was read to the jury as follows:  "Now, you've heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. In evaluating identification testimony, consider the following questions:  Did the witness know or have contact with the defendant before the event?  How well could the witness see the perpetrator?  What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance and duration of observation?  How closely was the witness paying attention?  Was the witness under stress when he or she made the observation?  Did the witness give a description, and how does that description compare to the defendant?  How much time passed between the event and the time when the witness identified the defendant?  Was the witness asked to pick the perpetrator out of a group?  Did the witness ever fail to identify the defendant?  Did the witness ever change his or her mind about the identification?  How certain was the witness when he or she made an identification?  Are the witnesses and defendant of different races?  Was the witness able to identify the defendant in a photographic or physical lineup?  Were there any other circumstances affecting the witness's ability to make an accurate identification?  The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

[4]      The trial court in *McDonald* instructed the jury with the 1979 version of CALJIC No. 2.21, which read as follows:  "A witness willfully false in one material part of his testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you shall believe the probability of truth favors his testimony in other particulars. However,

10

is presumed the jury followed the instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

The corroboration for the eyewitness identifications was provided by Jaramillo, who was convicted of the same crime as defendant. Defendant attacks this corroboration on various grounds. Defendant provides a list of Jaramillo's falsehoods to police and from his own trial and asserts that Jaramillo's testimony was "marred by inconsistencies and admitted lies, and colored by a possible early release (once eligible for parole) in exchange for his testimony." Defendant also characterizes the identifications by Hernandez and Sanchez as inconsistent, incomplete, and influenced by fear and stress. Defendant argues this was a close case, pointing to the lack of any evidence other than the witness identifications, defendant's junior status in the gang, and the jury queries.[5]

We disagree with defendant. Although Jaramillo was shown to have lied when interviewed by police and at times in his own trial, the corroboration he provided was sufficient. In *People v. Jones* (3003) 30 Cal.4th 1084, for example, the court found that the testimony provided by individuals who may have been accomplices met the *McDonald* standard, even though they could be impeached by proof of bias or prior inconsistent statements. (*Jones*, at p. 1112.) Although there were five of those individuals in *Jones*, as opposed to one Jaramillo, the corroborative effect, given the solid identifications by Sanchez and Hernandez, is the same. Jaramillo identified defendant as the shooter to police before defendant was even a suspect. As the jury was shown, the only benefit Jaramillo was to receive for his testimony was a letter from the prosecutor

discrepancies in a witness' testimony or between his testimony and that of others, if there were any, do not necessarily mean that the witness should be discredited. Failure of recollection is a common experience; and innocent misrecollection is not uncommon. It is a fact, also, that two persons witnessing an incident or a transaction often will see or hear it differently. Whether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance."

[5]    The jury requested readback of Hernandez's testimony, a transcript of Jaramillo's police interview, a complete list of the evidence, a CD player, and a recording of the original 911 call.

informing the parole board that Jaramillo had cooperated with the prosecution. Jaramillo was sentenced to 35 years to life and would not be eligible for parole for a very long time. The prosecutor's letter hardly constitutes a pass to "early release." Jaramillo knew the district attorney's office has no control over any decision by the parole board, should a parole hearing ever come to pass.

Although the identifications provided by Sanchez and Hernandez varied somewhat over time, overall they were "strong and unequivocal" identifications. (See *People v. Sanders* (1995) 11 Cal.4th 475, 509.) Sanchez and Hernandez chose defendant's photograph from a photographic lineup after not identifying anyone in the lineups in which defendant's photograph did not appear. The shooting occurred during daylight hours, and Sanchez testified he was only six to eight feet—a car length in fact—from the shooter. He had an unobstructed view.[6] Police showed him and Hernandez the photographic lineup very soon after the shooting. When selecting defendant's photograph, Sanchez wrote that defendant "was the one who shot." Sanchez also identified defendant at the preliminary hearing. Although Sanchez testified he did not see the shooter in court at trial, there was substantial evidence that defendant's appearance had changed a great deal in the three years between June 2009 and May 2012 when Sanchez testified. Defendant's height in Sanchez's initial description and at trial was different, but Sanchez was certain that defendant was "a little shorter" than Sanchez, who is five feet eleven. He estimated defendant's age at 25. Sanchez "got a good look" at the front of defendant's face, which may explain why he did not notice any tattoos.

Hernandez estimated she was about 15 feet away from the shooter, but she also estimated that the car right next to her, where the victim sat, was 15 feet away from her. She later amended her testimony to say the victim's car was closer, but also indicated her car was more or less in "the middle of both cars." She ducked slightly but watched the shooter because she was afraid she would be shot next, and her view was unobstructed.

---

**6** The front of Sanchez's car was only two feet from the Camry from which defendant emerged.

Defendant was facing her, and she remembered his face and his eyes. She testified she "was looking at his face throughout the process." Although Sanchez said Hernandez was "hysterical," it was Hernandez who had the presence of mind to tell Sanchez to memorize the license plate number of the shooter's car during the shooting.

Hernandez selected defendant's photograph from the photographic lineup as "the man who started shooting," and she identified him at trial and at the preliminary hearing. Hernandez testified that defendant looked different at trial than on the day of the shooting. He had more hair at the shooting, and at trial he wore glasses and was heavier. She estimated defendant's height at five feet eight inches. Although Hernandez reportedly told the first officers at the scene that she was not sure she would be able to identify the shooter, she did not recall saying that. The fact is, she had no trouble identifying him. That defendant was actually five feet six inches in height and only 18 years old are not details that discredit Sanchez's or Hernandez's identification of defendant's photograph. Even Jaramillo thought defendant was around 20 years old. Hernandez stated it was primarily defendant's face that she remembered.

Additionally, Officer Richard Medina, who responded to the shooting scene, reported that Sanchez described the suspect as 20 to 25 years of age, approximately five feet four to five feet five inches in height, and weighing approximately 165 pounds. Sanchez was sure he could identify the suspect if he saw him again. Officer Medina testified that Hernandez's description was consistent with that of Sanchez. Both said the suspect looked like a gang member. Officer Medina interviewed two other witnesses who gave the same description. They all said it was a bald male Hispanic.

Thus, defendant's case differs from *McDonald* in several ways. The witnesses who identified McDonald at his trial revealed varying degrees of certainty, whereas the photographic identifications by Hernandez and Sanchez were very strong. Here, defendant presented no alibi defense, whereas McDonald's alibi was very strong. Also, there was no one who testified that defendant was definitely *not* the shooter, as occurred in *McDonald*. (*McDonald*, *supra*, 37 Cal.3d at pp. 355-360.) And in this case, as opposed to *McDonald*, there was no cross-racial identification to muddy the waters.

13

Therefore, Dr. Shomer's general testimony on cross-racial identifications simply would not have provided a basis for a different verdict. Defense counsel extensively cross-examined both eyewitnesses regarding their accuracy and reliability. He questioned them regarding the differences in their statements at various times, such as immediately after the incident, at the preliminary hearing, at Jaramillo's trial, and at defendant's trial. Moreover, in closing argument, defense counsel vigorously and at length argued the unreliability of the identifications and the lies told by Jaramillo.

Even if we were to conclude that the trial court had abused its discretion in not allowing defendant to present Dr. Shomer's testimony, we would determine that any error was harmless. (See *McDonald*, *supra*, 37 Cal.3d at p. 376 ["[a]n error in excluding expert testimony may be found harmless"].) Here, by means of cross-examination, argument and the jury instructions, the jury was aware of the psychological factors and potential unreliability of eyewitness identifications. As in *People v. Plasencia* (1985) 168 Cal.App.3d 546, "the various psychological factors affecting eyewitness identification about which Dr. Shomer proposed to testify were either not relevant, or only marginally relevant. The jury did not need edification on the obvious fact that an unprovoked gang attack is a stressful event or that the passage of time frequently affects one's memory." (*Id*. at p. 555.) Under the circumstances of this case, it is not reasonably probable a different result would have occurred had the expert witness been allowed to testify.[7] (See *People v. Sanders*, *supra*, 11 Cal.4th at p. 510; *McDonald*, *supra*, 37 Cal.3d at p. 377; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

---

[7] We note that the type of expert testimony regarded favorably in *McDonald* has not been without its critics. As stated in *People v. Johnson* (1993) 19 Cal.App.4th 778, 788, "After *McDonald*, the Supreme Court determined, in 1988, that no 'consistency' of scientific view by experts on the principles governing the reliability of an eyewitness identification existed. Rather, the field is beset by dispute and uncertainty—as the Supreme Court recognized in *People* v. *Wright* (1988) 45 Cal.3d 1126, 1142, footnote 13, noting that most courts refuse to admit such testimony, since there is no consensus that it has scientific validity."

## II. Evidence of Defendant's Membership in a Criminal Street Gang

### A. Defendant's Argument

Defendant contends the prosecution failed to prove he belonged to a "criminal street gang" as defined in section 186.22, subdivision (f). According to defendant, the various cliques of the Playboys gang did not have a collaborative organizational structure, and the predicate crimes of two Los Angeles members of the Playboys gang could not be imputed to every gang member in every one of the Playboys cliques. Moreover, the lack of a collaborative structure was shown by the fact that defendant was convicted of attempting to murder a Playboys gang member from another clique, demonstrating that the gang was internally fragmented.

### B. Relevant Authority

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We resolve all conflicts in the evidence and questions of credibility in favor of the verdict, and indulge every reasonable inference the jury could draw from the evidence. (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The standard of review that governs a claim of insufficient evidence in support of a conviction also applies to a challenge to gang enhancement findings. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322.)

The credibility of witnesses and the weight to be accorded to the evidence lie exclusively within the province of the trier of fact. (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.) Reversal on this ground is unwarranted unless "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin*, *supra*, 18 Cal.4th at p. 331.)

To prove a gang enhancement allegation under section 186.22, subdivision (b)(1), the prosecution must prove that the crime for which the defendant was convicted had

been "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) In addition, the prosecution must prove that the gang is an "ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) A "'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" of the offenses listed in section 186.22, subdivision (e) when at least one of the offenses occurred "after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, subds. (e), (j); see *People v. Gardeley* (1996) 14 Cal.4th 605, 616-617.)

### C. Evidence Sufficient

Defendant relies on *People v. Williams* (2008) 167 Cal.App.4th 983 (*Williams*) for the proposition that some sort of "collaborative activities" or "collective organizational structure" must be inferable from the evidence in order to impute the activities of a larger gang to one of its multiple units. (*Id*. at p. 988.) Defendant's claim rests on his assertion that there was no evidence from which the jury could infer that the Playboys gang, with its various cliques, engaged in such activities or had such a structure. He also complains that the gang expert did not specify the cliques to which the perpetrators of the two predicate offenses belonged, or even if they were from the gangs in the Newton Division or the Olympic Division. We disagree.

In *Williams*, the defendant suffered a conviction for murder with an "active participant in a street gang" special circumstance (§ 190.2, subd. (a)(22)) and a conviction for being an active participant in a criminal street gang (§ 186.22, subd. (a)).

16

(*Williams*, *supra*, 167 Cal.App.4th at p. 985.) The prosecution's gang expert testified that the Peckerwoods gang was a criminal street gang and that smaller groups, such as the Small Town Peckerwoods, were all factions of the Peckerwood organization. (*Id*. at p. 988.) On appeal, the defendant contended that there was no evidence showing he was an active participant in any group other than the Small Town Peckerwoods. Therefore, any gang finding had to be based on that group and not on the larger Peckerwoods gang. (*Id*. at p. 987.)

The Court of Appeal agreed with the defendant and reversed the special circumstance finding and the gang-participation conviction. (*Williams*, 167 Cal.App.4th at pp. 988-989.) In defining "the relationship that must exist before a smaller group can be considered part of a larger group for purposes of determining whether the smaller group constitutes a criminal street gang" (*id.* at p. 985), the *Williams* court reasoned that "something more than a shared ideology [**8**] or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining whether a group constitutes a criminal street gang. Instead, some sort of collaborative activities or collective organizational structure must be inferable from the evidence, so that the various groups reasonably can be viewed as parts of the same overall organization." (*Id*. at p. 988.) In *Williams*, the court held that the prosecution failed to make such a showing. (*Ibid*.)

Based on the facts presented in the instant case, *Williams* is distinguishable. In that case, the prosecution failed to present sufficient evidence of "collaborative activities" among the various Peckerwood factions. (*Williams*, *supra*, 167 Cal.app.4th at p. 988.) Indeed, the expert in *Williams* testified that "Peckerwoods are not typically organized like other criminal street gangs . . . : for the most part, they have no constitution, and are a looser organization with a less well-defined rank structure. Peckerwood groups get together more for bragging than for strategizing, and one group of Peckerwoods will not

---

**8**     The gangs shared a White pride or White supremacist ideology. (*Williams*, at p. 988.)

17

necessarily know what another group is doing." (*Ibid.*) Here, there was expert testimony attesting to collaboration among the various cliques within the Playboys gang. Defendant and Jaramillo, who were both found guilty of the attempted murder of Diaz, were themselves from different cliques. It is true that, when asked if the "51 Playboys," to which Jaramillo belonged, affiliated with any other cliques, Jaramillo replied, "46, 56. That's it." We do not agree with defendant that this alone establishes that the various Playboys cliques did not have a collaborative organization structure. These may have been the only cliques that Jaramillo had constant contact with, but the accuracy of that statement was an issue for the jury to decide.

Officer Drenckhahn testified that the Playboys have a common symbol: the Playboy bunny. He stated that the cliques did not behave as independent gangs. A clique is merely a geographic or generational subsection of the gang. Officer Drenckhahn was assigned to Newton Division in June 2009. He named the cliques in the Newton Division and delineated the territory of the cliques in that division, which he stated were all affiliated. Thus, the jury learned that the 49th Street, 51st Street, 56th Street, 46th Street, and Chico Locos cliques are all affiliated. Each clique simply has a more direct connection with the area in which they grew up.

Officer Drenckhahn testified regarding two predicate offenses committed by two Playboys gang members. His testimony showed that one of the predicate crimes, an attempted murder, was committed by Marco Antonio Ramirez in 2008 while he was an active member of the Playboys gang. Officer Drenckhahn testified that the other predicate crime, illegal gun possession, was committed by Braulio Sandoval while he was an active member of the Playboys gang. Officer Drenckhahn was one of the officers who arrested Ramirez in 2008, indicating the arrest took place in the Newton Division. Sandoval's offense was also committed in 2008, and Officer Drenckhahn had continuous contact with Sandoval both before and after his arrest and had arrested him on other offenses. Therefore, there was sufficient evidence that the predicate crimes were committed by Playboy gang members who were from cliques that were at least affiliated with defendant's clique.

18

Moreover, Officer Drenckhahn's testimony established that defendant is an active member of the Playboys gang, not merely a clique. Defendant wore prominent Playboy bunny tattoos, and he was one of the 20 or 30 active gang members whom the officer saw on the streets daily while he was in the Newton Division. Jaramillo was also an active member of the Playboys gang, and Officer Drenckhahn arrested him for gun possession in the presence of at least two other documented Playboys gang members in territory claimed by the Playboys in the Newton Division. Jaramillo and defendant were part of the same group of 20 to 30 gang members. Diaz, on the other hand, was not active in that same neighborhood.

The fact that a gang member is subject to discipline from his own gang members is not probative of a rift in the gang structure, which, according to defendant, would indicate a lack of collaboration. Officer Drenckhahn testified that it enhances a gang's reputation if the gang is willing to discipline "their own" for stepping out of line. He stated it is common for gang members to discipline other gang members under the gang's code of discipline, and what occurred in this case was not unusual. Even the defense gang expert, Flores, acknowledged that "there can be consequences" if gang members "disrespect" each other, although he believed it to be unlikely that a younger member would have the right to discipline an older one. He had encountered many instances of internal discipline, and stated that there were varying levels of consequences. He testified that taking out a fellow gang member does occur, although Flores believed it showed weakness. Officer Drenckhahn did not agree that such discipline made a gang look weak, since it was common knowledge that discipline occurs and is part of doing business in a gang.

This case is unlike that of *Williams*, a case where the gang expert's opinion about two criminal street gangs appeared to have been influenced by the fact the gangs had a name containing the same word. The evidence unequivocally showed that the various cliques were affiliated and were part of the Playboys gang, and the jury could readily infer the cliques engaged in collaborative activities and had a collective organizational

19

structure from the evidence presented.  (See *Williams*, *supra*, 167 Cal.App.4th at p. 988.) Defendant's argument is without merit.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


                                        BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.