Filed 4/29/21  P. v. Martin CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>  v.<br><br>EDWIN LAMAR MARTIN,<br><br>      Defendant and Appellant. | D077515<br><br><br>(Super. Ct. No. SCN383129) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael D. Washington, Judge.  Affirmed and remanded with directions.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael P. Pulos and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Edwin Martin of sexually assaulting three vulnerable victims—a runaway teen and two homeless women—and falsely imprisoning one of them. The trial court sentenced Martin to three consecutive 15-to-life terms (one for each victim), plus three years for the false imprisonment.

Martin raises two issues on appeal. First, he contends the trial court erred by denying his motion for a mistrial after the prosecutor violated an in limine order that required her to admonish witnesses not to testify that Martin was known to have guns, and a victim testified that Martin displayed a gun before he sexually assaulted her. We conclude the trial court acted within its discretion by denying the mistrial motion, and instead striking the offending testimony and admonishing the jury to disregard it.

Second, Martin contends the trial court violated Penal Code section 654 (further undesignated statutory references are to the Penal Code) by punishing him for both falsely imprisoning a victim and forcing her to orally copulate him while he falsely imprisoned her. We agree, and direct the trial court to stay the sentence on the false imprisonment conviction.

In another sentencing issue, Martin and the Attorney General agree the trial court erred by staying certain sentences under section 654 instead of imposing them concurrently with the principal term. We agree, and direct the trial court to sentence Martin accordingly.

In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### Charges

In February 2018, Martin was charged with six offenses arising from his sexually assaulting three victims: forcible rape of 16-year-old G.M. (§ 261, subd. (a)(2); count 1); forcible rape (count 2) and forcible oral copulation (former § 288a, subd. (c)(2)(A) [now § 287]; count 3) as to Tracy;

2

and two counts of forcible oral copulation (counts 4 and 5) and one count of false imprisonment by violence (§§ 236, 237, subd. (a)) as to Norma. Each sex offense carried a multiple-victim enhancement allegation subjecting Martin to a potential sentence of 15 years to life, per count. (§ 667.61, subds. (b), (c), (e).)

## Prosecution Case

### G.M.

On December 20, 2017, 16-year-old G.M. was spending the day in a park in Escondido after having run away from home the night before. Martin approached her and asked if she wanted to smoke marijuana. G.M. initially declined, but eventually accepted the invitation. Although they had planned to smoke the marijuana in the back of the park, Martin instead led G.M. to his car and drove her to his apartment complex.

G.M. "had a . . . bad feeling," but followed Martin into his apartment and bedroom, where he gave her a pipe with a packed bowl of marijuana. G.M. sat on the edge of Martin's bed smoking the marijuana while he went to the bathroom. Martin returned to the bedroom naked, so G.M. stood up. Martin put his hands on G.M.'s shoulders and pushed her onto his bed with "a lot" of force. He pulled down her pants and inserted his penis into her vagina. G.M. told Martin "no" several times, "tried to get up," and "tried to force him off" of her, but she could not "get out from under him." Martin ejaculated inside of G.M. and told her "it was his fantasy" to impregnate her.

Martin eventually took G.M. back to the park. About one week later, G.M. disclosed the rape to a counselor, and then to police.

G.M. testified she did not know either of Martin's other victims in this case.

3

*Tracy*

Tracy met Martin sometime in 2017 while she was living on the streets in Escondido. In November 2017, she consensually orally copulated him at his apartment.

On the night of January 9, 2018 (about three weeks after Martin raped G.M.), Martin offered Tracy $50 to clean his apartment because his mother, with whom he lived, was sick. Tracy accepted, but told Martin she "was just going to clean"—she "wasn't going to do anything else" because their prior sexual encounter, though consensual, "wasn't a pleasant experience."

Martin let Tracy shower at his apartment before cleaning. When she got out of the shower, he handed her a towel, "rough[ly]" took her by the arm, put his hand over her mouth, and brought her to his bedroom. Tracy, who is 4'11", did not resist because she has "an extensive history of sexual abuse" and knew that if she resisted she would "get hurt."

Once inside Martin's bedroom, he shut the door and "barricaded it with some type of metal pole" so Tracy could not open it. Martin helped Tracy onto his bed, used one hand to hold her legs over her head in a "painful" position, used his other hand to cover her mouth, and inserted his penis into her vagina. Although Tracy "didn't say no," she "resisted, but didn't pull away." She testified "it felt like . . . rape."

After about 10 or 15 minutes, Martin took his hand off Tracy's mouth, "pulled [her] hair really tight," "pushed [her] head down to his penis," and forced it into her mouth. Martin ejaculated in Tracy's mouth and forced her to swallow.

Martin dropped off Tracy at a park the next morning. She initially told a park ranger she had been "assaulted" and "victimized," but did not "go into detail." A few weeks later, Tracy reported the assault to police.

4

Tracy testified she did not know G.M., and was only a "casual acquaintance[ ]" of Martin's other victim in this case (Norma), who had earlier introduced Tracy to Martin.

*Norma*[1]

Norma, a 38-year-old homeless woman, had an extensive history of drug use and dealing with Martin.[2]  In the late hours of January 12 or early morning hours of January 13, 2018 (a few days after Martin sexually assaulted Tracy), Martin asked Norma if she wanted to smoke a "blunt" with him.  She said yes.  They planned to buy rolling papers at a convenience store, but Martin instead drove Norma to his apartment.

When Norma was hesitant to enter Martin's apartment, he reassured her he was "not a weirdo" and was "not going to do anything to [her]." Although it "didn't feel right" in her "gut," Norma went with Martin into his apartment through the back gate.  Martin locked the gate and backdoor behind them.  Norma sat on a chair in Martin's bedroom, and he locked the bedroom door with a pole "that straddled the doorknob and went into the ground."  Norma thought, "Oh, shit"—she "was in some kind of trouble" because there were "[t]oo many locks."

Martin seemed angry that Norma had been with other men but not him.  His demeanor became aggressive, and he showed her several weapons

---

[1]  We provide more detail regarding Martin's sexual assault of Norma because it is the subject of Martin's section 654 challenge.

[2]  Norma testified against Martin under a grant of immunity pertaining to her testimony about her drug conduct.

that he had stored in his closet.[3]  Martin handed Norma some crystal meth and snorted a line.  Norma pretended to inject hers intravenously, but really injected it into a cigarette filter.  Martin kept asking her, " 'How are you feeling?' "  He pulled down his shorts and began masturbating.

Norma told Martin she wanted to leave, but he responded, "You are not fucking going [any]where till you suck my dick."  He grabbed her by the head, started shaking it, and "cuss[ed]" at her.  Norma was scared and cried.  Martin "got more aggressive" and told Norma "to be quiet" because "his mother was in the next room."  Norma pleaded with him to let her leave.

Martin called Norma an "[u]ngrateful bitch" for not giving him sexual favors after he gave her drugs.  Martin fought and "tussle[d]" with Norma for several hours to keep her from leaving.  He pushed her, grabbed her, threw her, pulled her hair, and hit her.  He "socked" her so hard he left knots on her legs, and he threatened to kill her and "take [her] sight" from her one good eye.  Whenever Norma thought about exiting through the door or a window, Martin blocked her.  He threatened to kill Norma, to "beat [her] ass," and that he would "not let [her] go until [she] sucked his dick."

Martin tried to unbutton Norma's pants, but she resisted and told him "[he] might as well kill [her]."  Martin then forced his penis into Norma's mouth, and she orally copulated him so "that he would let [her] go."  Martin pushed on the back of Norma's head and pulled her hair until he ejaculated or preejaculated in her mouth.

---

3    We discuss Norma's testimony about weapons in greater detail in Discussion part I.A., below.

A few minutes later, Martin reinserted his penis into Norma's mouth and ejaculated again. He then used his penis to aggressively rub ejaculate on Norma's face.

Norma asked Martin if she could leave, and he escorted her to his car to drop her off somewhere. When he dropped her off, he did not bring his car to a complete stop before pushing her out.

The next day, Norma—who was usually "uncooperative" with law enforcement—reported the sexual assault to police officers she approached in a parking lot.

Norma testified she did not know G.M., and knew Tracy only to the extent of exchanging pleasantries.

### Defense Evidence

Martin acknowledged he had had sexual encounters with G.M., Tracy, and Norma, but he maintained they were all consensual. He believed the women were falsely accusing him because they were "jealous and env[ious] because [he] [had] things." He also believed the police were conspiring against him.

Martin's mother testified that her bedroom and Martin's bedroom share a wall, and she did not hear any commotion coming from his room the night Norma claimed they had fought for hours.

### Prosecution Rebuttal Evidence

The detective who investigated Martin's case testified about her post-arrest interview of Martin. Portions of the recorded interview that impeached Martin's trial testimony were played for the jury.

The following statement by Martin during the interview was also played for the jury: "[I]t's pissing me off, that you['re] going to bring some

7

raggedy fucking bitches, drug-fiend prostitute ass bitches and believe what the fuck they say, when they sucked a million dicks a fucking day."

## Jury Verdicts and Sentencing

The jury found Martin guilty on all counts, and found true the multiple-victim enhancement allegations attached to each of the sex offenses.

The trial court sentenced Martin to the following consecutive terms:

| | |
|---|---|
| Count 1 (rape of G.M.): | 15 to life |
| Count 2 (rape of Tracy): | 15 to life |
| Count 3 (oral copulation by Tracy): | Stayed under § 654 |
| Count 4 (oral copulation by Norma): | 15 to life |
| Count 5 (oral copulation by Norma): | Stayed under § 654 |
| Count 6 (false imprisonment of Norma): | 3 years |

## DISCUSSION

## I. Denial of Mistrial

### A. Background

Martin moved in limine to "[e]xclude testimony from the witnesses . . . regarding suspicion that [Martin] is known to have guns." (Italics omitted.) The impetus for the motion was that "[i]n one or more statements[,] witnesses indicate[d] that [Martin] is known to have guns." Martin argued the evidence should be excluded as unduly prejudicial. (Evid. Code, § 352.)

At the hearing on the motion, the prosecutor advised that although she did not expect any witnesses would testify that they knew Martin owned guns, such evidence would be relevant to establish a lack of the victims' consent. Defense counsel countered that none of the victims had thus far indicated they submitted to Martin because they believed he had guns; thus, the evidence would be "inconsistent with . . . multiple previous statements,

8

and the only reason to proffer that evidence . . . would be to unfairly prejudice [Martin]."

The trial court granted the defense motion and "exclude[d] any testimony from any witness that [Martin] was a person known to have guns." The court also ordered counsel that "potential witnesses be likewise admonished not to make any reference to any knowledge that they might have had that [Martin] had guns and not to make any statements that suggest that during their testimony."

During direct examination of Norma, the prosecutor asked what was going through her mind when she saw Martin secure the bedroom door with the metal pole. Norma responded that she knew she "was in some . . . kind of trouble" because there were too many locks and Martin's "attitude was getting a little different." When the prosecutor asked how Martin's attitude was changing, Norma explained that Martin "started showing [her] weapons that he had stored in his closet. . . . [T]here was a taser, some knives, *a gun* or something." (Italics added.) Defense counsel immediately requested a sidebar conference, which the court granted.

During the sidebar, defense counsel reminded the court that it had granted the in limine "motion dealing with weapons and not having witnesses bring them up" and "instruct[ing] the prosecutor to admonish the witnesses not to bring it up."

The prosecutor acknowledged she had not admonished Norma regarding the in limine order, but explained that the testimony about the gun was unexpected because it was the first time Norma had mentioned one. Further, the prosecutor noted she had not had a chance to meet with Norma because Norma had recently been arrested for a probation violation, was in custody, and arrived late to the trial. Finally, the prosecutor argued that

9

Norma's testimony was probative and did not violate the in limine order because the court prohibited testimony that Martin was *known to* have guns, not that he *actually displayed one* immediately before committing a charged offense. The prosecutor suggested Norma's testimony was "subject to cross-examination because it's the first time we are hearing that" Martin displayed a gun, and subject to cross-examination of police witnesses to establish that their search of Martin's apartment pursuant to a warrant did not yield any weapons. The prosecutor assured the court she would move on to a new line of questioning.

When the court asked defense counsel what remedy he sought, counsel requested a mistrial. The court denied the request, explaining "that's an extraordinary remedy." In the alternative, counsel asked that the offending testimony "be stricken and that the jurors be . . . directed to disregard the information."

Back in open court, the trial court instructed the jury as follows: "Ladies and gentlemen, the last question and the last answer by the witness are to be disregarded. You are not supposed to consider that for any purpose during this trial. The motion to exclude is granted . . . ."

Defense counsel later established through cross-examination of a police detective that a search of Martin's residence revealed no weapons.

After the close of evidence, the trial court instructed the jury, "If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose."[4]

---

4    The court had similarly instructed the jury at the start of trial: "During this trial, the attorneys might object to questions asked of a witness. I'll rule on those objections according to the law. . . . [I]f I order the testimony

10

## B. **Legal Principles**

" 'A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged . . . .' " (*People v. Clark* (2011) 52 Cal.4th 856, 990 (*Clark*); see *People v. Montes* (2014) 58 Cal.4th 809, 888 ["A motion for ' "mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction." ' "]; *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094 (*Dunn*).) "Whether a particular incident is so prejudicial that it warrants a mistrial 'requires a nuanced, fact-based analysis,' which is best performed by the trial court." (*Dunn*, at p. 1094.)

"We review a trial court's order denying a motion for mistrial under the deferential abuse of discretion standard." (*Dunn*, *supra*, 205 Cal.App.4th at p. 1094; see *Clark*, *supra*, 52 Cal.4th at p. 990; *People v. Jenkins* (2000) 22 Cal.4th 900, 986 (*Jenkins*) [" 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' "].) " 'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Dunn*, at p. 1094.)

## C. **Analysis**

Although the prosecutor admittedly failed to comply with the trial court's in limine order that she admonish witnesses not to testify that Martin "was a person known to have guns," we conclude the trial court acted within the scope of its discretion in denying Martin's motion for a mistrial.

---

to be stricken, you are to disregard that testimony and not consider it for any purpose."

11

Martin acknowledges in his briefing that (1) "a curative instruction to disregard improper testimony ordinarily is sufficient to cure the prejudice of an improperly volunteered statement"; (2) "juries are presumed to follow a court's admonishment"; and (3) "the trial court struck the improperly volunteered testimony and admonished the jury." Martin maintains this is an extraordinary case to which these general principles do not apply. We disagree.

The extent of the violation of the in limine order was not extraordinary. As the Attorney General points out, Norma's testimony that Martin *showed her* a gun did not, strictly speaking, violate the order excluding testimony that Martin was *known to have* guns. Her testimony conveyed her firsthand observations just before Martin committed a charged offense, whereas the in limine ruling addressed rumor and speculation. Thus, we are left with the prosecutor's concession that she committed an essentially technical violation of the order by failing to admonish Norma regarding the scope of the order. In this circumstance, the trial court reasonably concluded the violation could be cured by striking Norma's testimony that Martin showed her a gun, and by instructing the jury to disregard the stricken testimony.

Martin further maintains the prosecutor's violation of the in limine order was extraordinary because Norma's testimony was irrelevant. He argues "[n]one of the charged offenses were alleged to involve weapons and the People never advised the court or the defense that it intended to elicit evidence that a complainant's will was overcome by the use of a firearm." We disagree. Norma's testimony that Martin displayed a gun before she orally copulated him was highly relevant to the issue of consent. (See *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 836 (*Daveggio and Michaud*) [evidence that police found a gun and crossbow in the defendants' van "was

12

relevant to whether the sexual penetration of [the victim] was accomplished by force or fear"]; *People v. Dearborne* (2019) 34 Cal.App.5th 250, 259 [the "defendant press[ing] what [the victim] thought was a gun up against her side . . . surely helped induce the fear needed to overcome [her] will."].)

Nor has Martin specifically contended or shown that the prosecutor's failure to disclose Norma's testimony—which the prosecutor, herself, stated was unexpected—undermined the testimony's relevance or violated any pretrial discovery or disclosure obligations.

Next, Martin suggests that evidence of gun-possession is uniquely inflammatory to juries and improperly suggests the possessor has a propensity "to brandish and use" them and is predisposed to violence. None of the authorities Martin cited support this assertion. (See *Jenkins*, *supra*, 22 Cal.4th at p. 1006 [involving cellmate's testimony that the defendant confessed to committing the charged offense]; *People v. Branch* (2001) 91 Cal.App.4th 274, 278 (*Branch*) [involving evidence of prior sexual molestation]; *People v. Sam* (1969) 71 Cal.2d 194, 204 [involving the defendant's propensity to kick people "with whom he disagrees"]; cf. *Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 836 [evidence of weapon-possession was not improper character evidence where the " 'fact' of . . . possession was relevant to prove something beyond defendants' 'disposition to commit' misconduct"]; *People v. Powell* (2018) 6 Cal.5th 136, 168 [evidence that the defendant possessed a gun shortly before the charged murder and had displayed it months earlier was relevant to the charged murder and "did not merely reflect general criminal propensity"].)

Finally, Martin argues that Norma's testimony about his gun-possession "had an incurable effect on [his] defense" by impeaching his testimony that all of the sexual encounters with the victims were consensual.

13

But "[e]vidence is not [unduly] prejudicial . . . merely because it undermines the opponent's position or shores up that of the proponent." (*Branch*, *supra*, 91 Cal.App.4th at p. 286.) Indeed, the " ' " ' "ability to do so is what makes evidence relevant." ' " ' " (*Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 824.) Moreover, the prosecutor suggested during the sidebar several ways the defense could impeach *Norma's* testimony (e.g., by cross-examining her about the fact she had never mentioned it before, and by establishing through police testimony that they found no weapons in Martin's apartment when they searched it).

In light of the nature of the prosecutor's violation of the in limine order, the court's striking of the offending testimony, and the court's repeated admonitions to the jury to disregard stricken testimony, the trial court did not abuse its discretion in denying Martin's motion for a mistrial.

## II. Section 654

Martin contends the trial court violated section 654 by punishing him for both falsely imprisoning Norma and for forcing her to orally copulate him while she was falsely imprisoned.[5] We agree.

### A. **Legal Principles**

Section 654 "generally precludes multiple punishments for *a single physical act* that violates different provisions of law [citation] as well as multiple punishments for an *indivisible course of conduct* that violates more than one criminal statute." (*People v. Newman* (2015) 238 Cal.App.4th 103,

---

5      Although Martin "did not object to his sentence in the trial court, . . . because a sentence imposed in contravention of section 654 is an unauthorized sentence, the error may be raised on appeal even in the absence of an objection." (*People v. Kelly* (2018) 28 Cal.App.5th 886, 903; see *People v. Brents* (2012) 53 Cal.4th 599, 618 (*Brents*).)

111-112; *People v. Rodriguez* (2009) 47 Cal.4th 501, 507.)[6] " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*Rodriguez*, at p. 507, italics omitted.) "If, on the other hand, '[the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Martin* (2005) 133 Cal.App.4th 776, 781; see *People v. Leonard* (2014) 228 Cal.App.4th 465, 499.)

"The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) "In the absence of any reference to . . . section 654 during sentencing, the fact that the court did not stay the sentence on any count is generally deemed to reflect an implicit determination that each crime had a separate objective." (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*Brents*, *supra*, 53 Cal.4th at p. 618.)

---

6    Section 654 provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, *but in no case shall the act or omission be punished under more than one provision*." (Italics added.)

## B. **Analysis**

Martin contends section 654 precludes punishing him for both falsely imprisoning Norma and forcing her to orally copulate him because the "false imprisonment was the means by which [he] accomplished the sex offense." The Attorney General maintains multiple punishments are permissible because Martin falsely imprisoned Norma not only with the intent to force her to orally copulate him, but also to attempt to rape her after she initially refused his attempts at oral copulation. Martin has the better argument.

Martin's position is supported by the California Supreme Court's decision in *People v. Latimer* (1993) 5 Cal.4th 1203 (*Latimer*). The victim in *Latimer* consensually entered the defendant's car, but the defendant did not stop where he was supposed to; instead he drove the victim to a desert and raped her and forced her to orally copulate him. (*Id.* at p. 1206.) The defendant then drove further into the desert and raped the victim again. (*Ibid.*) The defendant then drove further into the desert and stopped, at which point the victim jumped out of the car and fled. (*Ibid.*) The defendant pleaded no contest to two counts of rape and one count of kidnapping. (*Ibid.*) The trial court sentenced him to six years for each rape, and one year eight months for the kidnapping. (*Ibid.*) The Court of Appeal held that section 654 precluded punishment for both the kidnapping and the rapes, and the Supreme Court affirmed. (*Id.* at pp. 1206-1207.) The Supreme Court reasoned that "[a]lthough the kidnapping and the rapes were separate acts, the evidence does not suggest any intent or objective behind the kidnapping other than to facilitate the rapes. 'Since the kidnapping was for the purpose of committing the sexual offenses and [defendant] has been punished for each of the sexual offenses,' section 654 bars execution of sentence on the kidnapping count." (*Latimer*, at p. 1216.)

16

The Court of Appeal reached a similar result in *People v. Wall* (1979) 95 Cal.App.3d 978 (*Wall*), in which the victim voluntarily entered the defendant's car and he refused to let her out and raped her. (*Id.* at pp. 981-982.) The appellate court concluded that because the defendant's " 'intent and objective' was manifestly the crime of rape, and the false imprisonment was but a means of its accomplishment," the defendant could be convicted of both crimes, but "may be punished only for one." (*Id.* at p. 990; see *People v. Walker* (1983) 146 Cal.App.3d 34, 36-37, 41 [section 654 precluded punishment for false imprisonment and multiple sex offense committed during the false imprisonment].)

In contrast to *Latimer* and *Wall*, courts have allowed separate punishment for false imprisonment or kidnapping and a sex offense when the restraint on liberty and sex offense were independent of one another. (See *People v. Ratliffe* (1981) 124 Cal.App.3d 808, 818 (*Ratliffe*) ["If the sex crimes were an afterthought, appellant's course of conduct will not be deemed an indivisible transaction, because the crimes committed as an afterthought did not facilitate the commission of the initial offense (kidnapping)."]; *People v. Saffle* (1992) 4 Cal.App.4th 434, 439-440 (*Saffle*) [multiple punishment permissible where the defendant completed sex acts and then falsely imprisoned the victim to dissuade her from reporting the crime to the police].)

We find *Latimer* controlling, and *Wall* persuasive. Martin made clear to Norma that his objective in falsely imprisoning her was to facilitate forcing her to orally copulate him. When Norma first told Martin she wanted to leave his locked bedroom, he responded, "You are not fucking going [any]where till you suck my dick." Martin repeatedly blocked Norma as she attempted to flee, and reiterated he would "not let [her] go until [she] sucked his dick." It was not until immediately after Norma finished orally

17

copulating Martin a second time that he finally granted her request to leave. On this record, Martin's " 'intent and objective' was manifestly the crime of [forcible oral copulation], and the false imprisonment was but a means of its accomplishment." (*Wall, supra,* 95 Cal.App.3d at p. 990.) There is no indication the forcible oral copulation was "an afterthought" to the false imprisonment (*Ratliffe, supra,* 124 Cal.App.3d at p. 818), or that Martin falsely imprisoned Norma only after he had already forced her to orally copulate him to dissuade her from reporting him to the police (*Saffle, supra,* 4 Cal.App.4th at pp. 439-440).

Citing *People v. Perez* (1979) 23 Cal.3d 545 (*Perez*) and its progeny, the Attorney General maintains Martin harbored separately punishable criminal intents because he intended not only to force Norma to orally copulate him, but he also intended to rape her (as evidenced by his attempt to unbutton her pants while tussling) and to humiliate her (as evidenced by using his penis to aggressively rub his ejaculate on her face). The Attorney General's reliance on *Perez* is misplaced.

The defendant in *Perez* was convicted of rape, forcible sodomy, and forcible oral copulation for a sexual assault he committed against a single victim in a single location over the course of about 45 minutes to one hour. (*Perez, supra,* 23 Cal.3d at p. 549.) The trial court punished him for the rape, but stayed punishment under section 654 on the sodomy and oral copulation convictions. (*Perez,* at p. 549.) On the People's appeal, the *Perez* court rejected the defendant's contention that section 654 applied because his separate sex offenses were "all committed with the single intent and objective of obtaining sexual gratification." (*Perez,* at p. 550.) The *Perez* court found that "[s]uch an intent and objective is much too broad and amorphous" in the context of determining whether section 654 applies to sex offenses. (*Perez,* at

18

p. 552.)  Instead, the *Perez* court held that multiple sex offenses committed during a single course of conduct can be separately punished as long as "[n]one of the sex offenses was committed as a means of committing any other, none facilitated commission of any other, and none was incidental to the commission of any other."  (*Perez*, at pp. 553-554.)

Perez does not support the Attorney General's position for two reasons. First, it is factually distinguishable.  *Perez* considered only the imposition of punishment for one sex offense vis-à-vis other sex offenses; it did not consider multiple punishments for a sex offense vis-à-vis a non-sex offense.  (See *Perez*, *supra*, 23 Cal.3d at p. 551 ["Although certain general principles may be distilled from prior decisions on section 654, we do not attempt in this case to determine their proper application to other than sex offenses."].)  Indeed, the *Latimer* court repeatedly cited *Perez*, yet concluded section 654 precluded punishing the defendant for both the sex offense (rape) and the non-sex offense (kidnapping) committed to facilitate that sex offense.  (See *Latimer*, *supra*, 5 Cal.4th at pp. 1209, 1211, 1212.)

Second, even if *Perez* otherwise applied, it would not allow multiple punishment for Martin's false imprisonment and forcible oral copulation convictions because, as discussed above, Martin clearly committed the false imprisonment "as a means of committing"/to "facilitate commission of"/"incidental to the commission of" the forcible oral copulation.  (*Perez*, *supra*, 23 Cal.3d at pp. 553-554.)

The Attorney General argues—and we acknowledge—that by falsely imprisoning Norma and forcing her to orally copulate him, Martin is more culpable than he would have been had he committed only one offense or the other.  But the *Latimer* court observed that section 654's purpose of ensuring that punishments are commensurate with culpability will not always be

19

fulfilled. (See *Latimer*, *supra*, 5 Cal.4th at p. 1211 ["A victim . . . who is forcibly transported into the desert, then raped, would be astonished to learn that the rape and the kidnapping were considered to be the same 'act or omission' (§ 654), and would find little consolation in the explanation that the defendant had only a single 'intent and objective.' "].) We are bound to follow *Latimer*.

Thus, although *Perez* would allow Martin to be punished separately for forcing Norma to orally copulate him twice during the same course of conduct, *Latimer* does not allow him to be punished separately for the false imprisonment he committed as a means of committing those sex offenses.

Accordingly, we will direct the trial court to stay Martin's sentence on his false imprisonment conviction.

### III. Correction of Martin's Sentence

As noted, the trial court sentenced Martin to consecutive 15-to-life terms on counts 1 (raping G.M.), 2 (raping Tracy), and 4 (first count of forcing Norma to orally copulate him). The court exercised its discretion not to impose additional consecutive 15-to-life sentences on counts 3 (forcing Tracy to orally copulate him) and 5 (second count of forcing Norma to orally copulate him). Instead, the court stayed punishment on those convictions under section 654.

The parties agree section 654 does not preclude punishment on counts 3 and 5, and the trial court should have imposed 15-to-life sentences on those convictions, but run them concurrently to the principal term of 15-to-life on count 1. Consistent with our discussion in part II, above, we agree, and will direct the trial court to sentence Martin accordingly.

## DISPOSITION

The trial court is ordered to (1) impose a sentence of 15 years to life on each of counts 3 and 5, to run concurrently to the principal term of 15 years to life on count 1; (2) stay the sentence on count 6 (false imprisonment) under section 654; and (3) amend the abstracts of judgment to reflect these changes, and forward the amended abstracts to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


HALLER, Acting P. J.

WE CONCUR:


GUERRERO, J.


DO, J.